2020 IL App (3d) 180024

Opinion filed December 7, 2020
Modified Opinion Upon Denial of Rehearing filed February 19, 2021
_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2021

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 13th Judicial Circuit, Grundy County, Illinois. |
| Plaintiff-Appellant, | ) ) | |
| v. | ) ) | Appeal No. 3-18-0024 Circuit No. 17-CF-160 |
| | ) | |
| LONNIE WILLIAMS, | ) ) | The Honorable Robert C. Marsaglia, |
| Defendant-Appellee. | ) | Judge, presiding. |

_____

JUSTICE DAUGHERITY delivered the judgment of the court, with opinion.
Justice Lytton concurred in the judgment and opinion.
Presiding Justice McDade dissented, with opinion.
_____

**OPINION**

¶ 1    Defendant, Lonnie Williams, was charged with a Class X felony—unlawful possession of a controlled substance with intent to deliver (720 ILCS 570/401(a)(2)(A) (West 2016)). The trial court granted defendant's motion to quash arrest and suppress evidence. The State appealed. We reverse and remand for further proceedings.

¶ 2                                     I. BACKGROUND

¶ 3    Just prior to midnight on the evening of July 16, 2017, Deputy Aaron Cory stopped defendant's vehicle on Interstate 80 in Grundy County, Illinois, for failing to have a rear

registration plate. After Cory stopped defendant's vehicle, Cory saw that defendant had a valid, temporary registration sticker in his rear window. Having stopped defendant, Cory requested defendant's driver's license and proof of insurance. Defendant's driver's license was suspended. During a subsequent search of defendant's vehicle, a gun and a substance suspected to be cocaine were found. Suspected cocaine was also found in the back of Cory's squad car where defendant had been seated. Defendant was charged with the Class X felony of unlawful possession of a controlled substance with intent to deliver, in that "defendant knowingly possessed with the intent to deliver 100 grams or more but less than 400 grams of a substance containing cocaine."

¶ 4        On October 3, 2017, defendant filed a motion to suppress evidence, arguing that the initial stop of his vehicle was unlawful, his prolonged detention by Cory requesting his driver's license was unlawful, and his subsequent arrest was unlawful. At the motion hearing on December 12, 2017, Cory testified that at or around midnight on July 16, 2017, he saw defendant's vehicle pass him and it appeared that the vehicle did not have a rear license plate. Cory testified that, when defendant's vehicle was stopped and "once [he] approached the vehicle," he observed an Iowa temporary registration sticker in the upper left corner of defendant's rear window. Cory further testified that he also observed other motor vehicle violations on defendant's vehicle—no rear registration light (license plate light), a cracked taillight with red tape over it, and several air fresheners hanging from the rearview mirror. Cory explained to defendant that he had pulled him over for not having a rear license plate but now had observed the temporary registration sticker in the rear window. Cory requested defendant's driver's license and discovered it had been suspended. An inventory search of defendant's vehicle was conducted for the purpose of towing the vehicle.

¶ 5    At the hearing, the prosecutor conceded that the air fresheners hanging from the rearview mirror and the cracked taillight that was taped up with red tape were "clearly not going to support a stop in this case" and that neither side was making such an argument. The prosecutor argued, however, in addition to Cory stopping defendant for a missing license plate, defendant's vehicle also did not have a functioning light for the rear license plate.

¶ 6    The trial court indicated that, when it viewed the video of the traffic stop and listened to the testimony, the evidence was that it was dark outside, there was no license plate on defendant's vehicle, and once Cory stopped defendant's vehicle and walked up to it, Cory observed the valid temporary registration. The trial court noted that a different type of temporary registration is used in Iowa than in Illinois—in Illinois, a temporary registration plate is placed where the license plate would go and would be more clearly visible. The trial court found that the stop was lawful because it appeared that there was no registration on the vehicle and there was no way to know if there a valid registration "until the stop was effectuated and you were standing literally right next to the vehicle." The trial court took the matter under advisement on the narrow issue of whether Cory could ask for defendant's driver's license after he had recognized defendant's vehicle had a proper registration and continued the case.

¶ 7    On December 21, 2017, in its oral ruling (and in its subsequent written order filed on January 8, 2018), the trial court found the traffic stop was lawful because the vehicle's registration was not visible after dark to a stationary police vehicle. The trial court further found that Cory did not have the right to investigate defendant after he had made the stop and noticed the valid, temporary registration sticker in the rear window. The trial court found that the license plate light was also malfunctioning but there was no probable cause to support a stop (or prolong the stop) on that basis because no license plate was affixed to the area where the license plate

3

light would illuminate it. The trial court granted the motion to suppress because there was not an "effective *Terry* stop" at the point of when Cory asked for defendant's driver's license.

¶ 8 On December 21, 2017, the trial court filed a written order that indicated the motion to quash and suppress was granted and defendant was "hereby released *instanter* from the Grundy County Jail." On January 8, 2018, the trial court entered a written order containing its findings of fact in support of granting defendant's motion to quash arrest and suppress evidence. The trial court stated that it found as follows:

"1. Defendant was traveling on Interstate 80 on July 17, 2017, after dark. His vehicle was stopped by Grundy County Sheriff's Deputy Aaron Cory when the Deputy noticed that the vehicle had no rear license plate.

2. The Deputy approached the vehicle and observed a temporary license sticker taped in the rear windshield. The sticker was issued by the State of Iowa and was not visible at the time when the Deputy observed the vehicle. The temporary registration was current.

3. The Deputy also noted that vehicle did not have an operational rear registration light and that the vehicle had a cracked tail light.

4. The Deputy asked for the Defendant's driver's license and discovered that the driver's license was suspended. A subsequent search of the vehicle led to the arrest of the Defendant on felony possession charges."

¶ 9 The trial court additionally noted in the order that it had previously found that Cory had reasonable grounds to stop defendant's vehicle because no current registration was visible. The trial court noted that the issue then became whether Cory had the right to investigate further and that the State had argued Cory had sufficient grounds to investigate further because there was not

4

a functioning rear license plate light. The trial court found that the absence of the license plate light did not give Cory grounds to investigate further because there was no license plate affixed to the area of the license plate light. The trial court noted the registration was properly displayed in the rear windshield in a manner prescribed by the State of Iowa but that it was not visible after dark to a stationary police vehicle. The trial court granted defendant's motion to quash and suppress.

¶ 10        The State appealed.

¶ 11                                II. ANALYSIS

¶ 12        The State appeals the trial court's order granting defendant's motion to quash arrest and suppress evidence. Specifically, in its brief on appeal the State argues that the investigating officer, Cory, had sufficient probable cause to further investigate defendant, even after the probable cause for the stop had dissipated for lack of a proper vehicle registration being displayed, because defendant was also driving without a functioning license plate light. In support of its argument, the State cites section 12-201(c) of the Illinois Vehicle Code:

> "Either a tail lamp or a separate lamp shall be so constructed and placed as to illuminate with a white light a rear registration plate when required and render it clearly legible from a distance of 50 feet to the rear. Any tail lamp *** shall be so wired as to be lighted whenever the head lamps or auxiliary driving lamps are lighted." 625 ILCS 5/12-201(c) (West 2016).

The State argues that defendant's temporary registration on the rear windshield was not illuminated and, as such, defendant was committing a traffic violation so that Cory was "fully justified" in asking for defendant's driver's license.

¶ 13 In response, defendant requests that this appeal be dismissed because the State did not certify that its case has been substantially impaired by the trial court's pretrial suppression order granting defendant's motion to suppress. Defendant also takes issue with the fact that the State's jurisdictional statement in its brief on appeal failed to include the date of the order being appealed, the date the State's notice of appeal was filed, and the basis for this court's jurisdiction in violation of Illinois Supreme Court Rule 341(h) (eff. Nov. 1, 2017). Defendant argues that the State's failure to provide both a certificate of impairment and a proper jurisdictional statement in its brief on appeal should lead this court to dismiss the State's appeal.

¶ 14 Defendant additionally argues that the trial court properly granted his motion to suppress because Cory did have not probable cause to initially stop his vehicle and, even if the initial stop was lawful, the request for his driver's license impermissibly prolonged the stop in violation of article 1, section 6, of the Illinois Constitution of 1970 (Ill. Const. 1970, art. I, § 6) where the reasonable suspicion for the stop had vanished upon Cory seeing the valid temporary registration in his rear window. Defendant argues that his vehicle not having a rear license plate light did not provide probable cause to support prolonging the stop because a license plate was not required when he had a valid temporary registration sticker properly displayed in his rear window.

¶ 15 I. Lack of a Certificate of Impairment and Lack of a Proper Jurisdictional Statement

¶ 16 In his response brief, defendant makes procedural objections to the State's failure to file a certificate of impairment with its notice of appeal in order to pursue this interlocutory appeal and to the State's failure to provide a proper jurisdictional statement in its brief on appeal. The State did not file a reply brief in response to defendant's arguments regarding its alleged procedural shortcomings. The State has also made no request for leave to supplement the record with a certificate of impairment or request for leave to amend its jurisdictional statement.

6

¶ 17                                    A. Certificate of Impairment

¶ 18         Illinois Supreme Court Rule 604(a)(1) (eff. July 1, 2017) provides in pertinent part: "In

criminal cases the State may appeal only from an order or judgment the substantive effect of

which results in *** quashing an arrest or search warrant; or suppressing evidence." Our

supreme court has indicated that Rule 604(a)(1) allows the State to bring an interlocutory appeal

of a pretrial suppression order " 'whenever the prosecutor certifies to the trial court that the

suppression substantially impairs the State's ability to prosecute the case.' " *People v. Drum*, 194

Ill. 2d 485, 489 (2000) (quoting *People v. Young*, 82 Ill. 2d 234, 247 (1980) (recognizing the

necessity to permit the interlocutory review of suppression orders and also that those

interlocutory appeals should not be allowed where they would unnecessarily prolong the trial).

Because the certificate of impairment is not a jurisdictional requisite, the State's failure to file a

certificate of impairment does not deprive this court of jurisdiction. *People v. Kantowski*, 98 Ill.

2d 75, 79 (1983).

¶ 19         In this case, during oral arguments, the State's appellate attorney acknowledged that a

certificate of impairment had not been filed by the State but argued, "the record clearly showed

the State was impaired by the trial judge's granting of the motion to quash and suppress." This

court asked the parties' appellate attorneys if they were aware that the prosecutor's office had

filed a "certification of intent to appeal" at the circuit court level, which indicated:

              "The People hereby certify that the order of the trial court suppressing the

              evidence in this case has substantially impaired the ability of the People to

              prosecute this case. Therefore, the People state that they intend to pursue an

              appeal of this Court's order rescinding a Statutory Summary Suspension."

                                                    7

¶ 20     Both parties' appellate attorneys indicated they were not aware that the filing had been made. Defendant's appellate attorney argued that the "certification of intent to appeal" was insufficient to constitute a proper certificate of impairment by the State, noting that it referenced an order "rescinding a Statutory Summary Suspension" and no such order had been entered in this case. He also argued that it was not obvious from the record that the trial court's granting of the motion to quash and suppress had substantially impaired the State's case.

¶ 21     The record shows that the State filed its notice of appeal in the trial court on January 10, 2018. On January 18, 2018, a Grundy County prosecutor for the State filed the above-referenced "certification of intent to appeal" in the trial court. A notice of filing of the "certification of intent to appeal" was sent to the clerk of this district of the appellate court, the State's Attorneys Appellate Prosecutors office, and the Grundy County Public Defender's office. Defendant's appellate counsel was not on the notice of filing.

¶ 22     Here, although the State's appellate attorney was not aware that the prosecutor had filed a "certificate of intent to appeal" at the circuit court level, the State made no request for leave to supplement the record on appeal with a certificate of impairment. See *Kantowski*, 98 Ill. 2d at 78 (the State did not initially file a certificate of impairment but eventually filed a motion for leave to supplement the record in the supreme court and file a certificate of impairment; the supreme court concluded the certificate of impairment is not a jurisdictional requisite and allowed the State to supplement the record and file the certificate). Instead, the State's appellate attorney argued at oral arguments that the record "clearly showed" the State was impaired by the trial court's suppression order. Insofar as the State is arguing that the requirement of filing a certificate of impairment in the trial court can be circumvented where the record "clearly shows" that a suppression order substantially impaired the State's ability to prosecute the case, we reject

8

that argument. See *People v. Carlton*, 98 Ill. 2d 187, 192 (1983) ("[w]e hold that a certification of impairment must be filed in every case in which the People seek to appeal from a pretrial order suppressing evidence").

¶ 23    Nonetheless, while we cannot explain the superfluous reference to an order rescinding a statutory summary suspension mentioned in the "certification of intent to appeal," we find that the "certification of intent to appeal" sufficiently certified that the suppression order substantially impaired the State's ability in order for the State to bring an interlocutory appeal pursuant to Rule 604(a)(1). See *People v. Gabrys*, 2013 IL App (3d) 110912, ¶ 26 (whether a supreme court rule has been complied with presents a question of law that is reviewed *de novo*). Insofar as the certification may be argued as not properly being a part of the record on appeal, we accept the "certification of intent to appeal" as a supplement to the record on appeal pursuant to Illinois Supreme Court Rule 329 (eff. July 1, 2017) (providing "[m]aterial omissions or inaccuracies or improper authentication may be corrected by stipulation of the parties or by the trial court, either before or after the record is transmitted to the reviewing court, or by the reviewing court or a judge thereof"); *Robles v. Chicago Transit Authority*, 235 Ill. App. 3d 121, 126-27 (1992) (supplement allowed after oral argument). Rule 329 is a civil appeals rule that has been made applicable to criminal cases pursuant to Illinois Supreme Court Rule 612(b)(7) (eff. July 1, 2017). Therefore, the requirements of Rule 604(a)(1) for the State to bring this interlocutory appeal have been met.

¶ 24                    B. Failure to Provide a Satisfactory Jurisdictional Statement

¶ 25    Illinois Supreme Court Rule 341(h) sets forth the requirements for the contents of an appellant's brief. See Ill. S. Ct. R. 341(h) (eff. Nov. 1, 2017) (made applicable to criminal cases by Illinois Supreme Court Rule 612(b)(9) (eff. July 1, 2017)). The rules of procedure concerning

appellate briefs are not mere suggestions, and the failure to comply with the rules is not an inconsequential matter. *Hall v. Naper Gold Hospitality LLC*, 2012 IL App (2d) 111151, ¶ 7. A brief that lacks any substantial conformity to the pertinent supreme court rules may justifiably be stricken. *Id.* Where an appellant's brief does not comply with the rules, this court has inherent authority to dismiss the appeal for noncompliance. *La Grange Memorial Hospital v. St. Paul Insurance Co.*, 317 Ill. App. 3d 863, 876 (2000); *Niewold v. Fry*, 306 Ill. App. 3d 735, 737 (1999) (stating the appellate court has "discretion to strike the plaintiffs' brief and dismiss the appeal for failure to comply with Rule 341").

¶ 26        Rule 341(h)(4)(ii) requires that, for cases appealed to the appellate court, the appellant's brief contain a statement of jurisdiction indicating "the basis for appeal including the supreme court rule or other law which confers jurisdiction upon the reviewing court; the facts of the case which bring it within this rule or other law; and the date that the order being appealed was entered and any other facts which are necessary to demonstrate that the appeal is timely." Ill. S. Ct. R. 341(h)(4)(ii) (eff. Nov. 1, 2017). All facts recited in the statement of jurisdiction "shall be supported by page references to the record on appeal." *Id.* The purpose of the jurisdictional statement is not only to inform this court of its jurisdiction but also to provoke counsel into making an independent review of the right to appeal before writing the brief. *Hall*, 2012 IL App (2d) 111151, ¶ 8. "[A]n accurate jurisdictional statement is necessary to the orderly administration of justice." *Id.*

¶ 27        Here, the jurisdictional statement contained in the State's brief on appeal stated, "[t]his State appeal is brought pursuant to Supreme Court Rule 604(a) from the final judgment of the trial judge, granting defendant's motion to suppress statements." The statement of jurisdiction contained in the State's appellant brief did not include the date of the order being appealed or

10

provide applicable page references to the record on appeal. Consequently, under Illinois Supreme Court Rule 341(i), defendant (appellee) was required to provide a satisfactory statement of jurisdiction in his brief where the appellant's brief failed to do so. See Ill. S. Ct. R. 341(i) (eff. Nov. 1, 2017) (the brief for the appellee need not include a statement of jurisdiction "except to the extent that the presentation by the appellant is deemed unsatisfactory"). Despite the State's failure to provide this court with a proper statement of jurisdiction, the record, notice of appeal, and arguments presented on appeal make it clear that this appeal is being taken from the trial court's order granting defendant's motion to quash and suppress and is brought pursuant to Rule 604(a)(1). Because our jurisdiction is clear, we decline dismissing this appeal where the State's lack of compliance with Rule 341(h) by failing to provide a proper statement of jurisdiction does not hinder or preclude our review. See *In re Detention of Powell*, 217 Ill. 2d 123, 132 (2005) (striking an appellate brief is a harsh sanction and appropriate only where the alleged violations of procedural rules interfere with or preclude review).

¶ 28                  II. Defendant's Motion to Quash Arrest and Suppress Evidence

¶ 29        On appeal, the State argues that the trial court erred in granting defendant's motion to quash arrest and suppress evidence. In reviewing a trial court's ruling on a motion to suppress evidence, we apply a two-part standard of review. *People v. Lampitok*, 207 Ill. 2d 231, 240 (2003). Under this standard, we give great deference to and uphold the factual findings and witness credibility determinations of the circuit court unless those findings are against the manifest weight of the evidence. *Id.* However, we review *de novo* the trial court's ultimate legal ruling as to whether suppression is warranted. *Id.*

¶ 30        The fourth amendment of the United States Constitution and article I, section 6, of the Illinois Constitution of 1970 protect individuals from unreasonable searches and seizures. U.S.

11

Const., amend. IV; Ill. Const. 1970, art. I, § 6. The fourth amendment to the United States Constitution provides that the federal government shall not violate "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const., amend. IV. The due process clause of the fourteenth amendment of United States Constitution extends this constitutional guarantee to searches and seizures conducted by State officials. U.S. Const., amend. XIV; see also *Elkins v. United States*, 364 U.S. 206, 213 (1960).

¶ 31    Vehicle stops must comply with the fourth amendment's reasonableness requirement set forth in *Terry v. Ohio*, 392 U.S. 1, 20 (1968); *People v. Close*, 238 Ill. 2d 497, 505 (2010). Under *Terry*, an officer may conduct a brief investigatory stop where he "reasonably believes that the person has committed, or is about to commit, a crime." *Close*, 238 Ill. 2d at 505. A lawful seizure "can become unlawful if it is prolonged beyond the amount of time reasonably required to complete the [stop's] mission." *Illinois v. Caballes*, 543 U.S. 405, 407 (2005); *Arizona v. Johnson*, 555 U.S. 323, 333 (2009) (a seizure remains lawful only so long as unrelated inquiries do not "measurably extend" the stop's duration).

¶ 32                        A. Justification for the Traffic Stop

¶ 33    In this case, defendant argues that the trial court properly granted his motion to suppress because Cory lacked probable cause or reasonable suspicion to stop his vehicle. Defendant contends the trial court erred in ruling that Cory had sufficient grounds to stop his vehicle. Defendant acknowledges that the trial court found Cory to be credible in his testimony that he could not see the temporary registration until after he had stopped defendant's vehicle, but he argues the finding was against the manifest weight of the evidence. Defendant argues that the video of the traffic stop shows "a white object" in the rear window of defendant's vehicle prior to Cory activating his emergency lights and that the registration becomes "clearly evident once

12

the distance between the two vehicles is shortened in the seconds after the deputy activated his emergency lights." He also contends that it is "illogical" to find Cory's testimony that he was not able to observe "a large white piece of paper on the rear windshield" credible when Cory was able to observe "small details" of air fresheners hanging from the rearview mirror, a cracked taillight that had red tape affixed to it, and an inoperable registration light. The record shows that Cory testified that he did not see the valid temporary registration sticker in the rear window until after he stopped defendant's vehicle. In addition to Cory's testimony, the trial court also reviewed the video of the traffic stop in this case. The trial court's determination regarding Cory's credibility was not against the manifest weight of the evidence. While it could have been clear that a white piece of paper was attached to the rear window prior to the stop, Cory's testimony indicated that it appeared that defendant's vehicle did not have a valid registration until after defendant had been stopped. Therefore, we will not reverse the trial court's finding that Cory did not see a valid registration on defendant's vehicle prior to the stop. Consequently, the stop in this case was lawful. See *People v. Gonzalez*, 184 Ill. 2d 402, 413 (1998) (an officer may justifiably stop a vehicle based on his observation of a traffic violation).

¶ 34                    B. Continued Seizure After the Reason for the Stop Dissipated

¶ 35        The State argues that Cory was justified in requesting defendant's driver's license, even after the initial reason for the stop had dissipated, because there was an additional vehicle code violation of defendant's vehicle not having a functioning rear registration plate light to support further investigation, including the request for defendant's driver's license. Section 12-201(c) of the Illinois Vehicle Code provides, "[e]ither a tail lamp or a separate lamp shall be so constructed and placed as to illuminate with a white light a rear registration plate when required and render it clearly legible from a distance of 50 feet to the rear." 625 ILCS 5/12-201(c) (West 2016).

13

Section 12-201(c) was not applicable because a rear registration plate was not "required" where defendant instead had a valid, Iowa, temporary registration sticker attached to his rear window. Therefore, there was no violation of section 12-201(c) of the Illinois Vehicle Code. As such, the reason for the traffic stop had dissipated prior to Cory requesting defendant's driver's license.

¶ 36    We next turn to the issue of whether Cory's continued seizure of defendant to request defendant's driver's license, after the initial reason for the stop had dissipated, unreasonably prolonged the traffic stop in violation of defendant's constitutional rights. Both parties agree that, pursuant to our supreme court's decision in *People v. Cummings*, 2016 IL 115769, ¶ 20 (*Cummings II*), Cory did not violate defendant's fourth amendment rights under the federal constitution by requesting defendant's driver's license in this case.

¶ 37    In *Cummings II*, defendant Cummings was driving a van registered to a woman named Pearlene Chattic when officer Shane Bland pulled the van over because there was a warrant out for Chattic's arrest. *Cummings II*, 2016 IL 115769, ¶ 3. Upon approaching the vehicle, Bland saw that the driver was a man and could not have been Chattic. *Id.* Bland asked the defendant for his driver's license and proof of insurance before explaining the reason for the stop. *Id.* Bland cited the defendant for driving while his license was suspended (625 ILCS 5/6-303(d) (West 2010)). *Cummings II*, 2016 IL 115769, ¶ 3. In the trial court proceedings, the defendant's motion to suppress evidence was granted; on appeal, this court affirmed (*People v. Cummings*, 2013 IL App (3d) 120128)), and our supreme court affirmed this court's decision in *Cummings I*, finding the request for the defendant's driver's license impermissibly prolonged the seizure of the defendant where the officer's reasonable suspicion for the stop had dissipated prior to the request. *Cummings II*, 2016 IL 115769, ¶ 4 (citing *Cummings I*, 2014 IL 115769). The United States Supreme Court vacated the decision of our supreme court in *Cummings I* and remanded

14

the cause for reconsideration in light of its decision in *Rodriguez v. United States*, 575 U.S. ___, 135 S. Ct. 1609 (2015). *Cummings II*, 2016 IL 115769, ¶ 6.

¶ 38    In *Rodriguez*, the United States Supreme Court considered whether an eight-minute delay to conduct a drug-detecting dog sniff after a traffic stop had been completed impermissibly prolonged the stop in violation of the fourth amendment. *Id.* (citing *Rodriguez*, 575 U.S. ___, 135 S. Ct. 1609). The United States Supreme Court in *Rodriguez* held that the dog sniff, as a measure that was aimed at detecting evidence of ordinary criminal wrongdoing, was not part of the officer's mission for the traffic stop. *Id.* ¶ 7 (citing *Rodriguez*, 575 U.S. at ___, 135 S. Ct. at 1615). The *Rodriguez* Court defined the mission of a stop as addressing the traffic violation that warranted the stop and attending to related safety concerns, which would include ensuring that vehicles on the road are being operated safely and responsibly and making ordinary inquiries incident to the traffic stop, such as checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance. *Id.* (citing *Rodriguez*, 575 U.S. at ___, 135 S. Ct. at 1615).

¶ 39    On remand in *Cummings II*, our supreme court noted that defendant Cummings had not raised any arguments pertaining to any distinct protection under article I, section 6, of the Illinois Constitution of 1970 that would require a departure from a general fourth amendment analysis. *Id.* ¶ 9 (describing the limited lockstep approach in Illinois for synchronizing Illinois's constitutional search and seizure protections with the fourth amendment of the federal constitution (citing Ill. Const. 1970, art. I, § 6, and *People v. Caballes*, 221 Ill. 2d 282, 289-314 (2006))). Therefore, the sole question in *Cummings II* was whether, in light of *Rodriguez*, the officer's request for the defendant's driver's license after the reason for the stop had evaporated impermissibly prolonged the stop in violation of the fourth amendment. *Id.*

15

¶ 40    In *Cummings II*, our supreme court stated the following in reference to the *Rodriguez*
decision:

> "[T]he United States Supreme Court drew a bright line against prolonging a stop
> with inquiries outside the mission of a traffic stop, unless an officer has
> reasonable suspicion for those inquiries. It also provided firmer guidance as to
> which inquiries fall within that mission." *Id.* ¶ 7.

¶ 41    Our supreme court held that, "[b]ecause the stop [of defendant Cummings] was otherwise
reasonable in accordance with fourth amendment precedent, the driver's license request did not
involve the sort of stop-prolonging unrelated criminal investigation prohibited by *Rodriguez.*" *Id.*
¶ 10. "A traffic stop is analogous to a *Terry* stop, and its permissible duration is determined by
the seizure's mission." *Id.* ¶ 13 (citing *Rodriguez*, 575 U.S. at ___, 135 S. Ct. at 1614). The
seizure's mission consists of the purpose of the stop and related safety concerns. *Id.* (citing
*Rodriguez*, 575 U.S. at ___, 135 S. Ct. at 1614). Addressing the related safety concerns includes
making ordinary inquiries incident to the traffic stop, which typically involve checking the
driver's license, determining if there are any outstanding warrants against the driver, and
inspecting the vehicle's registration and proof of insurance. *Id.* (citing *Rodriguez*, 575 U.S. at
___, 135 S. Ct. at 1615). Those checks also serve to enforce the traffic code. *Id.* (citing
*Rodriguez*, 575 U.S. at ___, 135 S. Ct. at 1615). "Ordinary inquiries within the traffic stop's
mission clearly do not offend the fourth amendment." *Id.* ¶ 14 ("the *Rodriguez* Court made clear
that the ordinary inquiries serve officer safety as well as traffic enforcement"). "Ordinary
inquiries incident to the stop do not prolong the stop beyond its original mission, because those
inquiries are a part of that mission." *Id.* ¶ 15 (citing *Rodriguez*, 575 U.S. at ___, 135 S. Ct. at
1614-15). Our supreme court concluded that the stop of defendant Cummings was lawfully

16

initiated and, despite the officer's reasonable suspicion vanishing after the stop was initiated, the officer could still lawfully make ordinary inquiries incident to the stop, which included a driver's license request because "[s]uch ordinary inquiries are part of the stop's mission and do not prolong the stop for fourth amendment purposes." *Id. ¶* 18.

¶ 42 In this case, there is no dispute that our supreme court's decision in *Cummings II* makes clear that defendant's fourth amendment rights were not violated by Cory's request for defendant's driver's license. See *id. ¶¶* 13-18. Defendant argues, however, that his "continued seizure," after Cory learned that his vehicle was properly registered, violated his rights under article I, section 6, of the Illinois Constitution of 1970. In support of his argument that his "continued seizure" violated article I, section 6, of the Illinois Constitution of 1970, defendant contends this section of the Illinois Constitution provides "expanded protection against police intrusion" and "urges this Court to find that Article I, Section 6 of the Constitution of Illinois of 1970 prohibits an officer, as here in this matter, from further seizing a defendant once the officer's initial reason for the seizure has evaporated." Defendant specifically requests on appeal that this court hold that his "continued detention" violated the Illinois Constitution of 1970. The State, during oral arguments, argued that the facts of this case do not provide sufficient grounds for this court to depart from construing article I, section 6, of the Illinois Constitution of 1970 in "lockstep" with the fourth amendment of the federal constitution. Whether defendant's rights were violated under article I, section 6, of the Illinois Constitution of 1970 is solely a question of law that we review *de novo*. *People v. Fitzpatrick*, 2013 IL 113449, ¶ 12; *Caballes*, 221 Ill. 2d at 289.

¶ 43 Prior to the adoption of the 1970 Constitution in Illinois, our supreme court followed United States Supreme Court decisions interpreting the fourth amendment when interpreting the

17

search and seizure provision of this state's constitution of 1870. *Caballes*, 221 Ill. 2d at 292 (citing *People v. Williams*, 27 Ill. 2d 542, 544 (1963)). "The 'lockstep doctrine,' as it has come to be known, thus, has deep roots in Illinois and was firmly in place before the adoption of the 1970 constitution." *Id.* The search and seizure provision of the Illinois Constitution of 1870 provided, "[t]he right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated; and no warrant shall issue without probable cause, supported by affidavit, particularly describing the place to be searched, and the person or things to be seized." Ill. Const. 1870, art. II (1964), § 6. When the new state constitution was adopted in 1970, the search and seizure provision was replaced with the following language:

> "The people shall have the right to be secure in their person, houses, papers, and other possessions against unreasonable searches, seizures, invasions of privacy or interceptions of communications by eavesdropping devices or other means. No warrant shall issue without probable cause, supported by affidavit particularly describing theplace to be searched and the persons or things to be seized." Ill. Const. 1970, art. I, § 6.

¶ 44        Our supreme court has adopted a "limited lockstep" approach in construing article I, section 6, of the Illinois Constitution of 1970, meaning a court will " 'look first to the federal constitution, and only if federal law provides no relief turn to the state constitution to determine whether a specific criterion—for example, unique state history or state experience—justifies departure from the federal precedent.' " *Caballes*, 221 Ill. 2d at 309-10 (quoting Lawrence Friedman, *The Constitutional Value of Dialogue and the New Judicial Federalism*, 28 Hastings Const. L.Q. 93, 104 (2000)). Under the limited lockstep approach, we construe our state

constitution as providing greater protection than that provided by the federal constitution when the following criteria are met:

> " ' "We must find in the language of our constitution, or in the debates and the committee reports of the constitutional convention, something which will indicate that the provisions of our constitution are intended to be construed differently than are similar provisions in the Federal Constitution, after which they are patterned." ' " *Fitzpatrick*, 2013 IL 113449, ¶ 15 (quoting *Caballes*, 221 Ill. 2d at 310, quoting *People v. Tisler*, 103 Ill. 2d 226, 245 (1984)).

¶ 45    Our supreme court adopted the limited lockstep approach based upon its understanding of the intent of the drafters of the Illinois Constitution of 1970 "to allow consideration of state tradition and values as reflected by longstanding state case precedent." *Caballes*, 221 Ill. 2d at 314. The limited lockstep approach is "based on the premise that the drafters of the 1970 constitution and the delegates to the constitutional convention intended for the phrase 'search and seizure' in the state document to mean, in general, what the same phrase means in the federal constitution." *Id.* "We will not depart from the intent of the framers of the Illinois Constitution of 1970 or the understanding of voters who adopted it—to the extent we are able to discern it from the language used, the committee comments and the debate—to tip the balance in favor of expanding the scope of the right to be free from unreasonable searches and seizures that is already guaranteed by the fourth amendment." *Id.* at 316. Expanding the scope of the protections guaranteed by the state constitution can only be brought about by an amendment to the constitution or by the enactment of statutes by the General Assembly; such expansion of rights, however, is not a function of the courts. *Id.* at 316-17.

¶ 46 Our supreme court did a limited lockstep analysis for the purpose of article I, section 6, of our state constitution in *Caballes* and "determined that the framers intended for it to have the same scope as the fourth amendment." *Fitzpatrick*, 2013 IL 113449, ¶ 15 (citing *Caballes*, 221 Ill. 2d at 296-97). The presence of language that is unique to article I, section 6, of the Illinois Constitution of 1970 that is not contained in the fourth amendment to the United States Constitution—the right to be secure against unreasonable invasions of privacy by the State and the right to be secure against unreasonable interceptions of communications by the State—did not affect our supreme court's decision to continue to interpret the search and seizure clause of this state's constitution in lockstep with the search and seizure clause of the fourth amendment to the United States Constitution. *City of Chicago v. Alexander*, 2017 IL 120350, ¶ 60 (citing *Caballes* in support of its holding that the unique language contained in article I, section 5, of the Illinois Constitution of 1970 did not weigh against interpreting the right to assemble in lockstep with federal precedent interpreting a corresponding clause in the first amendment of the federal constitution).

¶ 47 In this case, defendant has provided no reason to depart from interpreting the search and seizure clause contained in article I, section 6, of the Illinois Constitution of 1970 in lockstep with the fourth amendment of the federal constitution. We acknowledge that this state's limited lockstep approach in construing our state constitution allows for consideration of " 'state tradition and values as reflected by long-standing state case precedent.' " *Fitzpatrick*, 2013 IL 113449, ¶ 16 (quoting *Caballes*, 221 Ill. 2d at 314). Defendant, too, acknowledges in his brief on appeal that article I, section 6, of the Illinois Constitution is interpreted by first looking to the federal constitution and departing from federal precedent only if "unique state history or state experience" justifies such a departure. Defendant cites our supreme court's decision in *People v.*

20

*Krueger*, 175 Ill. 2d 60, 75-76 (1996), as an example of our supreme court having previously interpreted article I, section 6, of the Illinois Constitution as providing broader protection from unreasonable searches and seizures than as is provided for under the fourth amendment.

¶ 48    In *Krueger*, our supreme court stated it was "knowingly depart[ing]" from its tradition of following the United States Supreme Court's decisions in fourth amendment cases by declining to follow the holding *of Illinois v. Krull*, 480 U.S. 340 (1987), and, instead, held that a statute authorizing certain no-knock searches was unconstitutional and that article I, section 6, required excluding evidence that had been seized pursuant to the unconstitutional statute. *Krueger*, 175 Ill. 2d at 70-71. In *Krull*, the United States Supreme Court had held that the fourth amendment exclusionary rule did not bar evidence obtained by an officer who had reasonably relied, in objective good faith, on a statute that allowed unconstitutional warrantless searches. *Krull*, 480 U.S. 340. Our supreme court declined to follow the holding in *Krull* because the *Krull* good-faith exception "does not comport with article I, section 6, of the Illinois Constitution of 1970." *Krueger*, 175 Ill. 2d at 70, 74 (rejecting the *Krull* good-faith rule as creating a "grace period for unconstitutional search and seizure legislation," during which constitutional rights of Illinois citizens could be violated with impunity, and holding the exclusionary rule arising out of our state constitution "continues to afford the protection abrogated by *Krull*"). In doing so, our supreme court noted this state's history of applying the exclusionary rule to bar evidence that had been gathered pursuant to a statute that authorized an unconstitutional search or seizure. *Krueger*, 175 Ill. 2d at 74-75.

¶ 49    *Krueger* is distinguishable from this case. "*Krueger* was based on this state's history of applying the exclusionary rule under the state constitution and also a long-standing state tradition of excluding evidence obtained under the authority of an unconstitutional statute." *Fitzpatrick*,

21

2013 IL 113449, ¶ 16 (citing *Krueger*, 175 Ill. 2d at 74-75 (noting the exclusionary rule has been

applied in Illinois for more than 70 years to suppress evidence gathered in violation of the

Illinois Constitution's prohibition against unreasonable searches and seizures and that to adopt

*Krull*'s extended good faith exception to the exclusionary rule "would drastically change this

state's constitutional law")). Here, evidence was not gathered under the authority of an

unconstitutional statute. Defendant provides no specific argument that the Illinois Constitution

provides broader protection than that of the fourth amendment in this situation and does not

assert a long-standing history and tradition concerning the facts at issue in this case. See

*Krueger*, 175 Ill. 2d at 75-76. Therefore, an exception to the lockstep doctrine in the fourth

amendment context is not applicable in this case. See *id.*

¶ 50        Consequently, in this case, we must construe the prohibition against unreasonable

searches and seizures contained in article I, section 6, of the Illinois Constitution of 1970 in the

same manner as the fourth amendment. In doing so, we note defendant's right to be free from

unreasonable searches and seizures was not violated by Cory requesting defendant's driver's

license after the reason for the stop had dissipated because such ordinary inquiries are part of the

traffic stop's mission and do not unreasonably prolong the stop for fourth amendment purposes.

See *Cummings II*, 2016 IL 115769, ¶¶ 13-18. So too, defendant's right to be free from

unreasonable searches and seizures provided by article I, section 6, of the Illinois Constitution of

1970 was not violated by Cory requesting defendant's driver's license after the reason for the

stop had dissipated. Therefore, the trial court erred in granting defendant's motion to quash arrest

and suppress evidence, and we reverse and remand for further proceedings.

¶ 51        As noted above, article I, section 6, of the Illinois Constitution of 1970 provides, "[t]he

people shall have the right to be secure in their persons, houses, papers, and other possessions

22

against unreasonable searches, seizures, invasions of privacy or interceptions of communications by eavesdropping devices or other means." Ill. Const. 1970, art. I, § 6. Defendant's argument was based solely upon his right to be free from unreasonable searches and seizures as provided by article I, section 6, of the Illinois Constitution of 1970. At no time in the trial court or on appeal did defendant assert or develop any argument related to the privacy clause of article I, section 6, of the Illinois Constitution of 1970. We, therefore, do not address this issue, which has been addressed by the dissent. See *People v. Givens*, 237 Ill. 2d 311, 329-330 (2010) (the appellate court erred by *sua sponte* considering an unbriefed issue where the error was not clear and obvious and could not have been resolved without speculating as to what the arguments of the parties would be); *People v. McNeal*, 405 Ill. App. 3d 647, 682 (2010) ("[r]eview of an unbriefed issue should only take place in the rare instance where the error is clear and obvious and based upon well-established precedent"). A reviewing court must refrain from raising an unbriefed issue when doing so would transform the court's role from that of a jurist into that of an advocate. *Id.* at 328 (citing *People v. Rodriguez*, 336 Ill. App. 3d 1, 14 (2002)). We further note that even if we had concluded that the privacy issue had been raised by defendant, it was forfeited. See Ill. S. Ct. R. 341(h)(7), (i) (eff. Nov. 1, 2017) (the parties' briefs shall contain an argument section, "which shall contain the contentions of the [party] and the reasons therefor"; "[p]oints not argued are forfeited and shall not be raised in the reply brief, in oral argument or on petition for rehearing").

¶ 52                                          III. CONCLUSION

¶ 53         The judgment of the circuit court of Grundy County is reversed, and this case is remanded for further proceedings.

¶ 54         Reversed and remanded.

23

¶ 55    JUSTICE McDADE, dissenting:

¶ 56    The majority reverses the ruling of the trial court granting defendant Lonnie Williams's motion to suppress evidence and remands the matter for further consideration. I would find that the trial court's decision, read with reasonable inferences and given proper deference, was correct and should be affirmed. I, therefore, respectfully dissent.

¶ 57                    Constitutional Privacy Properly Raised and Resolved

¶ 58    In reaching its decision, the majority has undertaken a thorough review of the federal search and seizure law relevant to this traffic stop. I agree with the majority that, consistent with that federal constitutional law and Illinois law interpreted in limited lockstep, (1) Deputy Cory had probable cause for the initial traffic stop of Williams, (2) that cause had dissipated, (3) there was no violation of section 12-201(c) of the Illinois Vehicle Code based on the dysfunctional license plate light, and (4) even in the face of all of that noncriminal activity, federal principles still authorized Cory to ask for Williams's driver's license. However, for the reasons that follow, I disagree with the majority's conclusion that Cory's request for Williams's license after probable cause for the stop had dissipated did not prolong the traffic stop in a manner offensive to the more protective principles of the Illinois Constitution.

¶ 59    It appears that the difference in these opinions derives entirely from the fact that I believe Williams has adequately invoked the privacy clause of the Illinois Constitution and the contrary belief of the majority that, because he has not advanced any arguments other than search and seizure or specifically related to privacy, he has forfeited any claim that the request for his license was improper under that provision.

¶ 60    Although the majority does address Williams's claim under article I, section 6, of the Illinois Constitution of 1970, which encompasses his main argument, it narrowed that argument

24

by stating that Williams believes his rights were violated under the *search and seizure provision* of article I, section 6. This is too restrictive and stingy an interpretation of Williams's issue. Specifically, he has asked this court to "affirm the trial court's ruling granting [his] motion to suppress evidence and quash his arrest" because Cory "violat[ed] article I, section 6, of the Illinois Constitution, which provides *expanded protection against police intrusion*" (emphasis added) when Cory continued to detain him after determining that he had the proper vehicle registration. As noted by the majority, the search and seizure provision of article I, section 6, of the Illinois Constitution of 1970 does not expand the protections afforded under the fourth amendment to the United States Constitution. Rather, the search and seizure provision of article I, section 6, is to be viewed in "limited lockstep" with the fourth amendment.

¶ 61        In fact, because there is also no issue in this case concerning interceptions of communications or eavesdropping, the *only* applicable *expanded protection* against police intrusion is that found in the privacy provision. Accordingly, the multiple references to expanded protection in Williams's brief could only be an invocation of the privacy clause, the sole relevant expanded protection provided by article 1, section 6. Thus, Williams adequately invoked the constitution's protection against unreasonable invasions of privacy, and the majority should have analyzed his claim and made determinations under both the search and seizure provision *and* the privacy clause of article I, section 6.

¶ 62        But the majority asserts there is nothing here to analyze because Williams has not developed any arguments related to a possible privacy claim. But he has. He has recognized that Deputy Cory had probable cause to stop him when he thought Williams was driving a vehicle without proper registration in the form of a license plate and has acknowledged that, under federal principles (see *Cummings II*, 2016 IL 115769, ¶ 20), Deputy Cory was authorized to ask

25

for and get his license even after that cause had dissipated. Yet despite those concessions to *federal* authority he persisted in his argument that Cory had no *right* to his driver's license and the private information it contained or unlocked. It was and is a simple, uncomplicated, uncluttered argument, and it was, in my opinion, a sufficient and effective invocation of the expanded privacy protection of the Illinois Constitution despite its spare nature.

¶ 63        Agreement with and acceptance of Williams's essential argument is reflected in the finding of the circuit court that, once the putative reason for a traffic stop had been discredited and cause for any seizure had dissipated, Cory no longer had a right to "investigate" or, put another way, to access any of Williams's information on or made available through his driver's license. Distilled to its essence, the trial court found that, if Deputy Cory had no legitimate basis under the vehicle code to stop Williams, he had no right to breach his privacy by even something as elemental as seeing his driver's license. Even though the trial court did not actually use the words "unreasonable invasion of privacy," the *affirmance* of its decision is entitled on appeal to the weight of two positive factors: (1) that the trial judge is presumed to know and to follow the law (*People v. Buchanan*, 211 Ill. App.3d 305, 322 (1991)), and (2) that an appellate court can affirm the decision of the trial court on any basis that finds support in the record (*Neilsen-Massey Vanillas, Inc. v. City of Waukegan*, 276 Ill. App. 3d 146, 151 (1995)). The trial court's decision in this case constitutes proper protection of Williams's privacy under article I, section 6, of the Illinois Constitution, and it should be affirmed.

¶ 64                        Additional Privacy Considerations

¶ 65        Cory stopped Williams because he observed that there was no license plate on the car—a violation of the Illinois Vehicle Code. However, in closer proximity to the vehicle, he was able to see a temporary paper license properly affixed on the rear window and knew that Williams

26

had not violated the statute as he had thought. He chose at that point to proceed with the stop. As he approached the driver's window, he was able to confirm that appropriate licensing was displayed. What Deputy Cory should have done was to explain to Williams that he had pulled him over in error, apologize for delaying him, and send him on his way. That course of conduct would have been consistent with the purpose of the fourth amendment as described above. More importantly it would have been compliant with his "mission" as described by the United States Supreme Court in *Rodriguez v. United States*, 575 U.S. ___, ___, 135 S. Ct. 1609, 1611 (2015) (explaining that the mission of a traffic stop includes the traffic violation that prompted the stop, along with related safety concerns, and the authority to seize a motorist's vehicle discontinues once the mission of the stop is, or reasonably should be, complete). But Deputy Cory did not do that. Nor did he report any actions or words by Williams that would have generated reasonable suspicion that he was committing or was intending to commit a crime.

¶ 66        Nonetheless, he chose, in the exercise of discretion, to ask Williams for his driver's license, initiating a series of steps that ultimately resulted in this appeal.

¶ 67        Because this is a dissent, I will take the opportunity, even though Williams did not, to expand upon the nature and scope of his personal privacy interests put at risk by and in need of protection due to unjustified access to his driver's license. I start with a reminder that the fourth amendment is part of the bill of rights—God-given and inalienable rights held by all persons in this country. They are inherent rights, not held as a grant from the government but with an express guarantee from the government that it will hold them sacred even against its own overreach.

27

¶ 68 My understanding of the *purpose* of the fourth amendment in traffic situations such as this one tracks the following quote from the Iowa Supreme Court, frames my belief about what *should* have happened during this stop, and buttresses my analysis of what actually occurred:

> "The question of whether an automobile stop may be extended to require production of documents may sound mundane, and even petty, but it is not. Thousands of persons drive upon the roadways daily. Further, the central purpose of constitutional provisions regarding search and seizure is to structure and limit the scope of police interference in the daily life of citizens. Generalized police discretion to engage in search and seizure is antithetical to search and seizure law." *State v. Coleman*, 890 N.W.2d 284, 296 (Iowa 2017) (citing *State v. Ochoa*, 792 N.W.2d 260, 287 (Iowa 2010)).

¶ 69 As our supreme court noted in *Caballes*, Illinois expands and formalizes the limitation on government intrusion:

> "Article I, section 6, of the Illinois Constitution of 1970, in addition to prohibiting unreasonable searches and seizures, prohibits 'unreasonable *** invasions of privacy or interceptions of communications by eavesdropping devices or other means.' [Citation.] The additional language 'expands upon the individual rights which were contained in Section 6 of Article II of the 1870 Constitution and the guarantees of the Fourth and Fourteenth Amendments to the United States Constitution." *Caballes*, 221 Ill. 2d at 318 (citing ILCS Ann., 1970 Const., art. I, § 6, Constitutional Commentary, at 522 (Smith-Hurd 1993)).

The delegates to the 1970 constitutional convention intended for article I, section 6, to be broader than the search and seizure clause contained in the fourth amendment of the United States Constitution.

¶ 70    Because this express privacy protection is not present in the federal constitution, our court, of course, cannot apply the limited lockstep doctrine to that clause. Instead, much of the guidance regarding how we are to interpret cases under the privacy clause is rooted in our supreme court's decision in *In re May 1991 Will County Grand Jury*, 152 Ill. 2d. 381, 389-91 (1992), and its progeny. The *Caballes* court explained this collection of cases as follows:

"In the wake of *Will County Grand Jury*, the privacy clause of article I, section 6, has been involved in various contexts. In one group of cases, this court has applied the two-part analysis of *Will County Grand Jury* to determine whether the privacy clause is implicated in the particular context of the claim and, then, if necessary, gone on to consider the reasonableness of the invasion. ***

In the other group of cases, although a party argued that the privacy clause was implicated, this court determined that the situation should instead be examined entirely under traditional search and seizure principles." *Caballes*, 221 Ill. 2d at 322-23.

¶ 71    Thus, as it pertains to cases under the privacy clause, *Will County Grand Jury* created a two-part test which first asks whether the privacy clause is, in fact, "implicated in the particular context of the claim," and secondly, "consider[s] the reasonableness of the invasion." *Id.* at 322. Had the majority begun its analysis with this question, I believe it would have found (1) that the claim made by Williams is the type of privacy concern the drafters intended to protect, and

(2) that Cory's choice to ask for Williams's driver's license in this case was both unwarranted and unreasonable.

¶ 72    Our supreme court conducted this two-part analysis in *Caballes*, where it specifically addressed the question of whether a dog sniff of a vehicle during a routine traffic stop implicates the privacy clause contained in article I, section 6, of the Illinois Constitution. *Caballes*, 221 Ill. 2d at 289. The *Caballes* court began its analysis with an explanation of the privacy clause and noted that the search and seizure "provision was substantively changed by inclusion of," *inter alia*, "the right to be secure against unreasonable invasions of privacy by the state." *Id.* at 293. In fact, "the delegates [to the 1970 Illinois Constitution] made a 'conscious decision' to leave the search and seizure provision unchanged but to add [a] new provision[ ] dealing with privacy." *Id.* at 299 (citing *Tisler*, 103 Ill. 2d at 255-58 (Ward, J., concurring)).

¶ 73    Moreover, the *Caballes* court noted that, although the search and seizure provision of article I, section 6, was not intended to add new or additional concepts to the Illinois Constitution than that of its sister clause under the federal constitution, "[t]he clause creating an additional right to privacy *** was added to article I, section 6, in response to a concern that the government *** would collect and monitor personal information." *Id.* at 318 (citing 3 Record of Proceedings, Sixth Illinois Constitutional Convention 1525 (statements of Delegate Gertz). In fact, "it is evident that the privacy clause of article I, section 6, may be implicated in the context of a criminal investigation" and as such "the state's intrusion into the individual's bodily zone of privacy must be reasonable." *Id.* at 329-30. The court further noted that our courts have historically viewed "the touching of a person's body during a *Terry* stop and search," which requires an officer have reasonable suspicion before undertaking, as a search and seizure issue. *Id.* at 327; see *Terry*, 392 U.S. at 30 ("We merely hold today that where a police officer observes

unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous *** and where nothing in the initial stages of the encounter serves to dispel his reasonable fear for his own or others' safety, he is entitled for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him.").

¶ 74    Our supreme court then specifically addressed Caballes's argument that a dog sniff "invades the zone of privacy guaranteed by article 1, section 6, and offends the dignity and well-being of the subject of the sniff." *Caballes*, 221 Ill. 2d at 319. In rejecting Caballes's claim, our supreme court noted that, historically, cases analyzed under the privacy clause of article I, section 6, "have *** involved either the exposure of personal information or close scrutiny of personal characteristics." *Id.* at 323. Distinguishing its instant case, the *Caballes* court found that a dog sniff of an individual or of his or her vehicle is not the type of claim that implicates the privacy clause. *Id.* at 331. In other words, a dog sniff falls within the second group of cases emanating from *Will County Grand Jury*—those interpreted under the search and seizure provision of article I, section 6.

¶ 75    In arriving at this conclusion, the *Caballes* court noted:

> "A dog sniff does not reveal private medical information ***. A dog sniff will not reveal the contents of diaries or love letters; it will not reveal the individual's choice of reading materials, whether religious, political, or pornographic; it will not reveal sexual orientation or marital infidelity. Thus, it does not infringe on the zone of personal privacy that the drafters intended to protect. ***

31

Indeed, once the dog sniff has been conducted, no search will ensue unless the dog alerts to the scent of illegal narcotics." *Id.* at 331. However, the choice to ask a motorist for his or her license *does* reveal personal information about a person, which should remain private from the police officer in the absence of a reasonable suspicion that he or she is committing a crime. It reveals a motorist's name, signature, address, height, weight, race, and eye and hair color, and if the officer chooses to proceed further still by conducting a database query, the list of personal information he or she can gather on a motorist becomes even more extensive. When not predicated on reasonable suspicion, this type of query is invasive and, for many, threatening and justifiably intimidating. Thus, I would argue that the inclusion of the privacy clause in article I, section 6, of the new constitution was intended to protect against the exposure of the type of personal information and potentially intimate details about motorists placed at risk by the type of unrestricted police discretion that we see in this case.

¶ 76    Most importantly, a dog sniff does not implicate the type of implicit racial biases and systemic racism that are alive and well when human beings become involved. A dog sniff, the *Caballes* court reasoned, "has been described as a 'binary search' or a 'content-discriminating' search, because it yields *only a yes-or-no answer*, not an inventory of the contents of the vehicle ***." (Emphasis added.) *Id.* at 332 (citing Ric Simmons, *From Katz to Kyllo: A Blueprint for Adapting the Fourth Amendment to Twenty-First Century Technologies*, 53 Hastings L.J. 1303, 1348 (2002)).

¶ 77    There is a reason dogs are preferred for this type of search. Dogs trained to indicate the presence of drugs in a given area do *only* that. They do not have preconceived opinions as to

32

whether drugs will be found in a given space or on a given person due to immutable characteristics such as race, color, gender, etc. Dogs also do not make value judgments about a group of individuals based on whether they previously found a group member with contraband. People are different. We are motivated by more than our noses. We see in color and are motivated by race, even when we do not intend to be. We *do* make value judgments about groups of individuals, which we then use to guide future decision-making, even when we do not intend to do so. This concept has been termed "implicit bias," and it is a large contributor to systemic racism—systems and structures that operate in a manner disadvantageous to people of color—a pervasive pattern that flourishes at every level of our society. The following review of data collected by the Illinois Department of Transportation ("IDOT") will help demonstrate this concept.

¶ 78      I want to be absolutely clear here: I do not impute personal racial animus or racial bias to Deputy Cory; indeed, I am unaware of any basis for doing so. My assumption is that he was merely following existing policy and practice developed by people who cannot be absolved of importing such biases into everyday police practices.

¶ 79      Each year, more than 900 law enforcement agencies throughout Illinois collect and report data to IDOT—including why a driver was stopped, the driver's race, whether a search was conducted, whether contraband was located, and the outcome of the traffic stop—providing Illinoisans with insight as to the unique nature of Illinois roadways and traffic stops. Ill. Dep't of Transportation, Illinois Traffic and Pedestrian Stop Study 2017 Annual Report, at 1, http://www.idot.illinois.gov/Assets/uploads/files/Transportation-System/Reports/Safety/Traffic-Stop-Studies/2017/2017%20ITSS%20Executive%20Summary.pdf [https://perma.cc/A2QY-X3DB] (hereinafter 2017 IDOT Report).

33

¶ 80          "In 2017, law enforcement agencies in Illinois reported 2,284,919 traffic stops to IDOT,"

which represents a 5% increase over 2016. *Id.* at 2. In the 2017 IDOT Report, IDOT analyzed

"pre-stop measures" (the likelihood that minority drivers will be stopped by a law enforcement

agency) with "post stop measures" (the result of a traffic stop) to determine the extent to which

race played a role in Illinois traffic stops. *Id.* at 4. Based on all data reported to IDOT in 2017, a

minority driver in Illinois was nearly 50% more likely to be stopped by law enforcement than a

nonminority driver. *Id.* at 5. This represents an increase from 2016, during which a minority

driver was about 38% more likely than a nonminority driver to be stopped by a police officer. *Id.*

¶ 81          Among drivers who were stopped by police officers in Illinois in 2017, African American

drivers were asked to consent to searches during traffic stops about 60% more than white drivers,

and Latino drivers about 40% more than white drivers. However, white drivers were found in

actual possession of contraband during consent searches about 30% more often than both African

American and Latino drivers. *Id.* at 10. From this unique data set, a clear disparity has emerged,

which identifies African American and Latino drivers as the disadvantaged victims of implicit

bias and, ultimately, systemic racism, which has provided police with unfettered discretion on

Illinois roadways.

¶ 82          The problem that Williams ultimately presents—largely unfettered police discretion

giving rise to disparate racial treatment—is not new to this court. It was addressed in dissent in

*People v. Roa*, 377 Ill. App. 3d 190, 206 (2007). In *Roa*, Sergeant Floyd Blanks, a seasoned

officer who had worked for the Illinois State Police for 17 years, obtained consent to search

Andres Roa's vehicle, during which contraband was discovered. *Roa*, 377 Ill. App. 3d at 192.

The trial court denied Roa's motion to suppress evidence, and Roa appealed to this court for

review. *Id.* at 195. Affording great deference to the "hunches" of Sergeant Blanks, formulated

during his many years as a police officer and his extensive training and experience in drug interdiction, the majority affirmed the trial court's denial of Roa's motion to suppress. *Id.* at 203.

¶ 83        Pointedly, despite Sergeant Blanks' 17-year tenure with the State Police, and his training and expertise, he admitted that when he asked for consent to search an individual's car, his "hunches" proved *wrong* 67% of the time. *Id.* at 211. It is likely "hunches" like those which Sergeant Blanks indulged that are responsible for the escalating racial bias documented in the 2017 IDOT Report, and the countless fruitless traffic searches to which minorities and nonminorities alike are subjected on Illinois roadways.

¶ 84        Here, the majority's decision to narrow Williams's argument to the search and seizure provision of article I, section 6, and forgo a thoughtful analysis under the privacy clause was wrong. A privacy analysis under article I, section 6, is appropriate in this case because, in contrast to a dog sniff, the officer's decision to enter a motorist's zone of privacy, prolong the motorist's traffic stop, and demand his or her personal and identifying information, without at least reasonable suspicion that he or she has committed or is about to commit a crime, does, without a doubt, implicate the personal privacy the 1970 drafters sought to protect. When not predicated on reasonable suspicion or reasonably grounded officer safety concerns, an officer's demand for a seized motorist's license or other identifying information is an invasive, intimidating, and, particularly in today's climate, frankly terrifying experience. As previously noted, this demand elicits potentially extensive personal information to which an officer is not entitled in the absence of a clear statutory violation—information of the type the privacy clause was added to the 1970 Illinois Constitution to protect.

¶ 85        Moreover, the 2017 IDOT Report demonstrates that largely unrestricted officer discretion has created a climate in which implicit racial bias and systemic racism can flourish. It is because

35

of this police discretion, and the biases it accommodates, that minority drivers were stopped 50% more often on Illinois roadways in 2017, that African American and Latino Illinois motorists are asked for consent to search their vehicles at rates far greater than white motorists, and that these disparities exist despite statistics showing that white motorists are significantly more likely to be found with contraband as a result of a consent search. These facts undermine society's trust in law enforcement, which makes both Illinois motorists and Illinois police officers less safe.

¶ 86    In this case, whether explicitly or implicitly, directly or indirectly, I believe Williams's race drove Deputy Cory's request for his license and the prolonged traffic stop that ensued. Our courts need to recognize that systemic racism is a pervasive pattern. When officers act on hunches and without reasonable suspicion and when data that is unique to our state demonstrates that the privacy of motorists on Illinois roadways is affected by the color of their skin, we, as courts, aid and abet systemic racism by failing to, at the very least, address the issue. Illinois motorists have given police officers our trust that they will patrol the roadways and perform their traffic mission in an honest, fair, and evenhanded manner. However, IDOT's data demonstrates that this trust has been undermined under the onslaught of documented abuse. In light of this loss of trust and in reliance on our constitution's privacy clause, if there is not a specific and articulable criminal causal basis for an officer to ask a motorist for his or her driver's license, and/or to seek out other inherently personal information, our courts have a duty to deny our *imprimatur* to the manner of the disclosure and the subsequent use of information or evidence flowing from the invasion of privacy.

¶ 87    For all these reasons, I respectfully dissent from the majority opinion.

**No. 3-18-0024**

| | |
|---|---|
| **Cite as:** | *People v. Williams*, 2020 IL App (3d) 180024 |
| **Decision Under Review:** | Appeal from the Circuit Court of Grundy County, No. 17-CF-160; the Hon. Robert C. Marsaglia, Judge, presiding. |
| **Attorneys for Appellant:** | Jason Helland, State's Attorney, of Morris (Patrick Delfino, David J. Robinson, and Justin A. Nicolosi, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| **Attorneys for Appellee:** | James E. Chadd, Peter A. Carusona, and James Wozniak, of State Appellate Defender's Office, of Ottawa, for appellee. |

37