# Illinois Official Reports

## Appellate Court

---

### *People v. McDaniel*, 2021 IL App (2d) 190496

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. TADELLE A. McDANIEL, Defendant-Appellant. |
| District & No. | Second District<br>No. 2-19-0496 |
| Filed<br>Rehearing denied | August 17, 2021<br>September 20, 2021 |
| Decision Under Review | Appeal from the Circuit Court of Winnebago County, No. 17-CF-2027; the Hon. John S. Lowry, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | James E. Chadd, Thomas A. Lilien, and April D. Kentala, of State Appellate Defender's Office, of Elgin, for appellant.<br><br>J. Hanley, State's Attorney, of Rockford (Patrick Delfino, Edward R. Psenicka, and Miles J. Keleher, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| Panel | JUSTICE JORGENSEN delivered the judgment of the court, with opinion.<br>Justices Zenoff and Schostok concurred in the judgment and opinion. |

¶ 1    A jury convicted defendant, Tadelle A. McDaniel, of two counts of predatory criminal sexual assault (720 ILCS 5/11-1.40(a)(1) (West 2016)) of a child and six counts of aggravated criminal sexual abuse (*id.* § 11-1.60(c)(1)(i)), based on his conduct in relation to two minors, A.D.M. and K.T.F. The trial court sentenced defendant to an aggregate prison term of 20 years, consisting of consecutive 7-year terms on each of the predatory criminal sexual assault counts, to be served consecutively to concurrent 6-year terms on each of the aggravated criminal sexual abuse counts.

¶ 2    Defendant appeals, contending the trial court erred when it instructed the jury it could consider, on the issue of his propensity to commit sex offenses against other children, evidence of defendant's sexual assault of a different minor, J.J. We disagree and affirm.

¶ 3                    I. BACKGROUND
¶ 4                    A. The Charges
¶ 5    A grand jury indicted defendant on two counts of predatory criminal sexual assault and six counts of aggravated criminal sexual abuse. Specifically, the charges alleged defendant, between (1) November 27, 2015, and April 30, 2017, made contact with his hand to A.D.M.'s "butt" and chest and (2) January 1, 2017, and April 30, 2017, penetrated K.T.F.'s vagina with his finger and tongue, made contact with his hand to K.T.F.'s vagina, "butt," and breast, and placed K.T.F.'s hand on his penis.

¶ 6                    B. Pretrial Proceedings
¶ 7    Before trial, the State moved, under section 115-10 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/115-10 (West 2016)), to admit hearsay statements made by A.D.M. to her mother, Alicia H., and Joanna Deuth, a forensic interviewer at Carrie Lynn's Children's Center (Carrie Lynn), and made by K.T.F. to her mother, Taranesha F., Mandy Saunders, and Kim Larson, a forensic interviewer at Carrie Lynn. After a hearing, the trial court granted the State's motion.

¶ 8    Defendant informed the State he would be relying, in part, on an alibi defense, which he intended to support with his employment records from the relevant time frames. He confirmed he was asserting an alibi defense both at a later hearing and on the day trial commenced.

¶ 9    Additionally, the State moved *in limine* to admit evidence of defendant's prior sexual assaults of J.J. to establish defendant's *modus operandi*, intent, motive, and lack of mistake, and also to establish, under section 115-7.3 of the Code (725 ILCS 5/115-7.3 (West 2018)), his propensity to commit sex offenses. The court granted the motion, finding the evidence could be considered by the jury on the issues of defendant's identity and on his propensity to commit sex offenses. With respect to section 115-7.3, the court noted it had considered the three statutory factors, *i.e.*, the proximity in time, the degree of factual similarity, and other relevant facts and circumstances, and found the probative value of the evidence outweighed its prejudicial effect. *Id.* § 115-7.3(c). On the remaining issues, the court found defendant had placed his identity at issue by raising an alibi defense, and, after noting the probative value of the evidence outweighed its prejudicial effect, it granted the motion as to the issue of defendant's identity.

¶ 10    After the jury was selected but before it was sworn, the State moved *in limine* to bar defendant from mentioning his alibi defense until after he presented evidence to support it because the employment records he provided did not, in fact, establish he could not have committed the offenses. During argument on the motion, defendant noted that, because the State had not alleged he had committed the offenses on specific dates or at specific times, he could not provide a complete alibi. He nevertheless stated he would be presenting the evidence, would be relying on a partial alibi defense, and therefore should be permitted to mention his alibi defense in his opening statement. The court denied the State's motion.

¶ 11    The court also informed the parties that at the end of the case it would be giving a limiting instruction in relation to the other-crimes evidence, specifically Illinois Pattern Jury Instructions, Criminal, No. 3.14 (approved Oct. 17, 2014) (hereinafter IPI Criminal No. 3.14), instructing the jury it could consider the evidence only on the issues of identity and propensity. The court told defense counsel to discuss with defendant whether he also wanted the instruction read before the State's presentation of the other-crimes evidence.

¶ 12                              C. Trial Proceedings
¶ 13                    1. *The State's Evidence Regarding A.D.M.*
¶ 14    A.D.M., age 10 and in the fourth grade at the time of trial, testified that, when she was in second grade, she would spend the night with her grandmother, Patricia H., when her mother worked. Patricia went to work on some of those nights, and Jean Johnson and defendant, her cousin, would be there.

¶ 15    A.D.M.'s memory of the assaults was "a little fuzzy" given she had since aged two years, but she recounted that defendant had touched her chest outside her clothes and "once or twice" inside her clothes and had touched her "legs" inside and outside her clothes, all of which occurred at Patricia's house.[1] She did not recall where in Patricia's house she was at the time of the assaults but recalled they happened in the afternoon. Additionally, on one occasion, A.D.M. was getting ready to shower, so she asked defendant if he had to first use the bathroom. Defendant told her "no" but, while doing so, "moved his [private part] up and down."

¶ 16    At the end of second grade, A.D.M. came home from school and overheard her mother and her aunt discussing something that had happened to K.T.F. A few weeks later, A.D.M. went to Carrie Lynn and spoke with someone about what defendant had done to her.

¶ 17    Deuth testified that, on June 12, 2017, she interviewed A.D.M. at Carrie Lynn. The interview was videorecorded, and a digital video disc (DVD) of the interview was admitted into evidence and published to the jury. We have reviewed the video. It is not inconsistent with A.D.M.'s trial testimony, but she provided additional detail as compared to her trial testimony.[2] For instance, she told Deuth she would often be home with defendant, Johnson, and her other cousin but defendant did not touch her when others were around. She demonstrated how defendant touched her leg, showing Deuth he did so in a rubbing motion. She also described one incident in which she woke up from a nap on the couch to defendant, with his hand down the top of her shirt, touching her chest. (She did not use any specific term to refer to the area,

_____

[1]A.D.M. did not testify he touched her breasts, but the report of proceedings shows A.D.M. demonstrated to the jury where he touched her.

[2]She referred to the "private" parts of her "chest" as "breasts" during the interview. See *supra* ¶ 15 n.1.

- 3 -

but, when asked to circle the area on a diagram of a female body, she circled the right breast.) After that incident, she went upstairs, and defendant told her not to tell anyone. A.D.M. also related incidents in which defendant touched her "butt." He once "randomly" "tapped" her "butt" over her clothes and once touched it under her clothes while she was sitting on the living room floor. She also told Deuth she never told anyone about defendant's conduct because she was afraid she would get in trouble.

¶ 18 Alicia testified that, in 2016, defendant moved into Patricia's home. At the time, Alicia worked the night shift on Wednesday through Saturday and, when she worked, A.D.M. stayed at Patricia's house. Patricia worked second shift, from 2 p.m. to 11 p.m. Johnson acted as "the adult supervisor." Defendant was also present and would often play with and buy "goodies" and pizza for A.D.M. and other children who would come over.

¶ 19 In May 2017, A.D.M. told Alicia defendant had touched her "chest." Alicia did not contact police but, in June 2017, took A.D.M. to Carrie Lynn so A.D.M. could be interviewed.

## 2. The State's Evidence Regarding K.T.F.

¶ 21 K.T.F., age 14 and in eighth grade at the time of trial, testified she lived with her mother, Taranesha, and four siblings in Rockford. Defendant began dating K.T.F.'s mother when K.T.F. was in fifth grade, and he stayed at her house on certain weekends. K.T.F. testified that, when she was 12 years old, defendant touched her "chest" and her vagina under her clothes "more than once."[3] Some of the assaults occurred at night and others during the day. Some occurred while they were alone in the living room, and others occurred in the bedroom she shared with one of her sisters (on some occasions her sister was in the room asleep and on others she was not). K.T.F. denied defendant's finger penetrated her vagina. He also, on one occasion, touched her vagina with his tongue at night while they were alone in the living room. On another occasion, he exposed his penis to her in the middle of the night in the kitchen as she was getting a drink of water. And, on another, he asked her to touch his penis, which she refused.

¶ 22 In April or May 2017, Taranesha asked her whether defendant had touched her, and after initially not responding, she eventually told her mother he had. She later spoke to Saunders and someone at Carrie Lynn about what defendant had done.

¶ 23 Larson testified that, on May 16, 2017, she interviewed K.T.F. at Carrie Lynn. The interview was videorecorded, and a DVD of the interview was admitted into evidence and published to the jury. We have reviewed the video, and it is largely consistent with K.T.F.'s trial testimony, except she provided more detail of the assaults.[4] For instance, she described and mimicked how defendant's hand moved when he touched her vagina. She also provided more detail as to how defendant placed his tongue on her vagina, adding that defendant pulled her clothes down and, though she resisted, defendant forced the assault. In addition, K.T.F. told Larson defendant had "rubb[ed] on" her "butt" both over and under her clothes and placed her hand on his penis (over his clothes).

---

[3]K.T.F. did not testify defendant touched her "breasts," but after acknowledging girls' chests look different from boys' chests, she stated she called the "private" area on her upper body her "chest."

[4]She referred to the "private" parts of her "chest" as "breasts" during the interview. See *supra* ¶ 15 n.1.

- 4 -

¶ 24    Taranesha testified she and defendant began a romantic relationship in 2016 and, every other weekend, defendant would stay at her home, where she lived with K.T.F. and her four other children. He typically arrived in the afternoons on Friday or Saturday. Otherwise, defendant lived with Patricia, his aunt, where other adults and children would often be present. When Taranesha showed affection to or hugged defendant, K.T.F. "would get like upset and like try to push [Taranesha] away and hug [defendant]." Defendant showed K.T.F. special treatment as compared to Taranesha's other children, buying her expensive gym shoes and talking and playing with her more often.

¶ 25    On May 6, 2017, Taranesha and defendant got into an argument through text messages, during which she accused him of cheating on her. The next day, she smelled an odor, like "puberty hair," on K.T.F.'s clothes, which she had previously smelled on defendant's hand. She asked K.T.F. if defendant had touched her. K.T.F. told her "no." She asked again, and K.T.F. said "no." She asked K.T.F. a third time if defendant had touched her, and K.T.F. "finally" replied "yes," telling Taranesha defendant had touched her "private area" but not offering any details.

¶ 26    On May 9, 2017, Saunders spoke with K.T.F., who told Saunders defendant would wake her up in the middle of the night, kiss her, touch her breasts, and touch and digitally penetrate her vagina.

¶ 27    Shannon Krueger, a nurse and expert in the field of child sexual assault, examined K.T.F. and took from her a history. K.T.F. told her defendant had touched her breasts, vagina, and buttocks with his hands, put his mouth on her breasts and vaginal area, and made her touch his penis. Krueger physically examined K.T.F. and said that K.T.F. had a "normal exam," though that did not rule out sexual abuse.

¶ 28                              3. *The State's Evidence Regarding J.J.*

¶ 29    J.J., age 17 at trial, testified defendant was her "step cousin" and would occasionally babysit her, starting when she was 5 years old. (He also babysat her brothers.) He watched her both at her house, when he lived with her, and at his apartment, where he lived with Kayleigh Vickerman. She did not like going to defendant's house because "he would touch [her] in inappropriate ways," which made her feel uncomfortable.

¶ 30    She further testified she would often spend the night at defendant's one-bedroom apartment and would sleep either in the bed with defendant and Vickerman or on the floor with J.J.'s brothers. At night, as Vickerman and her brothers slept in the same room, defendant would wake her up, put his hand down her pants and inside her underwear, and touch and rub the outside of her vagina. It happened every time she stayed at his apartment, from when she was 5 or 6 years old until she was 11. Defendant told her not to tell anyone and said, if she did so, he would hurt her parents.

¶ 31    Defendant stopped babysitting her when she told her mother and her grandmother she was uncomfortable. She also told her grandmother, but not her mother, what defendant had been doing. In May or June 2017, she learned about "something that happened to [K.T.F.] and [A.D.M.]" and told the police what defendant had done to her "[b]ecause [she] wanted to be there for [them], and [she] felt like it was [her] fault what had happened to them because [she] didn't speak out sooner."

¶ 32    Cassidy H., J.J.'s mother, testified she began dating defendant's cousin, Desi H., in 2003 and, at the time, they lived in Janesville, Wisconsin, along with J.J. and their other children. In 2005, defendant moved in with them. In 2008, Desi was sent to prison, forcing Cassidy to move to her mother's house. Defendant no longer lived with Cassidy and her children after the move, but he remained in Janesville and lived with his girlfriend. Defendant, however, watched her children, including J.J., a couple of times per week until 2013. Defendant also contacted Cassidy and asked to watch her children about once a month. When Cassidy made arrangements for J.J. to stay with defendant, J.J. became upset, did not want to go, and would sometimes cry.

¶ 33    *4. Defendant's Evidence*

¶ 34    Before defendant proceeded with his case, the State objected to the admission of defendant's employment records, again arguing the records did not support an alibi defense. Defendant responded the purpose of proffering the records was to show he had limited access to A.D.M. and K.T.F. The court overruled the State's objection and, pursuant to the parties' stipulation, admitted defendant's payroll records from Stoughton Trailers in Stoughton, Wisconsin.

¶ 35    Vickerman testified that, in 2008, she and defendant began dating and lived together until 2012 in an apartment in Milton, Wisconsin, and later with her mother in Janesville. During that period, defendant babysat J.J.'s brothers every other weekend but never babysat J.J., and J.J. never visited where they were living. She never saw defendant act inappropriately with J.J. On cross-examination, Vickerman acknowledged giving a written statement to an investigator, which stated, "When [J.J.] would stay the night[,] she never slept in the same room with [defendant] and me." On redirect, however, she clarified her statement might have been referring to when she and defendant would stay the night at Cassidy's house.

¶ 36    Defendant, age 32 at the time of trial, testified he lived with Cassidy and her children, including J.J., for a time and occasionally took care of J.J. and her brothers, beginning when J.J. was six or seven years old. When he cared for the children, Cassidy's brother, Derrick Sisson, was also present. Defendant had his own room and never slept in the same bed as J.J.

¶ 37    In 2008, when Desi went to prison, defendant moved to Janesville and lived with Vickerman and her parents. In 2009, he and Vickerman moved into an apartment in Milton. When he moved to Vickerman's parents' house, he did not watch Cassidy's children, but, when he and Vickerman moved to their apartment, he resumed watching J.J.'s brothers. He did not resume watching J.J. though, because J.J. "had a smart mouth on her" and they did not get along. Specifically, J.J. "got smart with Kayleigh," so defendant "put [J.J.] in her place" and told her not to come to his house anymore. Instead, Cassidy's mother watched J.J. J.J. never came to his apartment, and though J.J. "tried to come over," he "denied it" because he did not like watching her.

¶ 38    In June or July 2015, defendant began working at Stoughton Trailer. He drove to and from work, usually leaving his house around 3 a.m. and returning around 6 p.m. But, on Fridays, he ended work around 1:30 or 2 p.m. and was back home by 4 p.m.

¶ 39    In 2016, defendant moved in with Patricia and Johnson in Rockford. He denied ever babysitting A.D.M. and denied ever being alone with her. Eventually, he began dating Taranesha and spent every other weekend at her house in Rockford. Defendant denied ever being alone with K.T.F.

¶ 40        Defendant denied ever inappropriately touching J.J., A.D.M., or K.T.F.

¶ 41                        5. *Jury Instructions and Verdict*

¶ 42        Before J.J.'s testimony, the court and the parties discussed a limiting instruction for the other-crimes evidence and whether defendant wanted it read before the evidence was presented. The court noted the evidence had been admitted on the issues of defendant's propensity and identification. The court informed the parties, based on *People v. Perez*, 2012 IL App (2d) 100865, it was not comfortable giving a limiting instruction including one of those purposes but not the other. The court asked defense counsel whether he wanted the instruction read before the other-crimes testimony, and counsel replied, "The exact reason I don't want it read is I don't want the matter of propensity highlighted." The court indicated it would not give the instruction before the testimony but stated, "It's got to come in at the end." During the discussion, counsel told the court he did not want the jury instructed on propensity at the close of the evidence either but understood the court's ruling. The court told counsel he could submit an instruction on the issue if he wished.

¶ 43        At the jury instruction conference, the court and the parties again discussed IPI Criminal No. 3.14. The State proposed the following instruction, a modified version of IPI Criminal No. 3.14, which the court ultimately gave over defendant's objection:

> "Evidence has been received that the defendant has been involved in conduct other than those charged in the indictment.
>
> This evidence has been received on the issues of defendant's identification and propensity to commit sex offenses against children and may be considered by you only for that purpose.
>
> It is for you to determine whether the defendant was involved in that conduct and, if so, what weight should be given to this evidence on the issues of identification and propensity to commit sex offenses against children."

Defendant reiterated his position that he did not want any reference to propensity included in the instruction because it would transform the instruction to "the opposite of a limiting instruction" and would enhance the prejudicial value of the other-crimes evidence. Defendant did not offer any alternative language to the instruction the State proposed. The court found omitting a reference to propensity would not give the jury a full, accurate description of the law because it had allowed the other-crimes evidence on the issues of both identification and propensity.

¶ 44        During its deliberations, the jury asked the court "What is propensity? Definition." After discussing the question, the court, with the parties' agreement, told the jury it had received its instructions on the law and "[w]ords that are not defined in these instructions shall be given their ordinary, every day meaning[s]."

¶ 45        The jury found defendant guilty of all eight charges.

¶ 46                        6. *Motion for New Trial*

¶ 47        Defendant moved for a new trial, arguing, in part, the court erred by giving the modified version of IPI Criminal No. 3.14 with the reference to propensity. At the hearing on the motion, defendant reiterated his position that the instruction "was the opposite of a limiting instruction," noting "the whole purpose of a limiting instruction is that we don't have a jury go

and consider evidence [which has been admitted for some other purpose] for propensity" and that the instruction enhanced the prejudicial effect of the other-crimes evidence. The court denied the motion, noting it had admitted the other-crimes evidence on the issues of identity and propensity and finding the instruction accurately stated the law and did not mislead the jury.

¶ 48                                7. *Sentencing*

¶ 49     The court sentenced defendant to an aggregate prison term of 20 years, consisting of consecutive 7-year prison terms on each of the predatory criminal sexual assault convictions, to be served consecutively to concurrent 6-year terms on each of the aggravated criminal sexual abuse convictions. This appeal followed.

¶ 50                                II. ANALYSIS

¶ 51     On appeal, defendant contends the trial court erred by instructing the jury it could consider the other-crimes evidence relating to his assaults of J.J. on the issue of his propensity to commit sex offenses against children. Specifically, he argues the other-crimes evidence was inherently prejudicial and the jury instruction highlighted that prejudice. He also argues, for the first time in his reply brief, the court erred in instructing the jury it could consider the other-crimes evidence on the issue of identity because he did not assert an alibi defense but, rather, presented evidence that his opportunity to commit the charged offenses was reduced by reason of his employment, which was not a true alibi defense.

¶ 52                             A. Standard of Review

¶ 53     "The purpose of jury instructions is to provide the jury with the correct legal principles applicable to the evidence, so that the jury may reach a correct conclusion according to the law and the evidence." *People v. Bannister*, 232 Ill. 2d 52, 81 (2008); see also *Marsh v. Sandstone North, LLC*, 2020 IL App (4th) 190314, ¶ 34 ("The function of jury instructions is to convey to the jury the correct principles of law applicable to the submitted evidence and, as a result, jury instructions must state the law fairly and distinctly and must not mislead the jury or prejudice a party." (Internal quotation marks omitted.)). Accordingly, jury instructions should be neither misleading nor confusing. *Bannister*, 232 Ill. 2d at 81. We review *de novo* whether the instructions properly conveyed the legal principles the jury must apply. *People v. Parker*, 223 Ill. 2d 494, 501 (2006).

¶ 54                       B. Other-Crimes Evidence Generally

¶ 55     Other-crimes evidence is unquestionably prejudicial, and its admission runs the risk of "prov[ing] 'too much,' rendering a jury inclined to convict the defendant simply because it believes that he or she is a bad person deserving of punishment." *Perez*, 2012 IL App (2d) 100865, ¶ 45. However, under the common law, such evidence may be admitted for limited purposes, such as establishing the defendant's motive, identity, presence, *modus operandi*, knowledge, intent, common design, or absence of mistake, but not his or her propensity, provided the probative value of the evidence outweighs its prejudicial effect. *Id.*; Ill. R. Evid. 404(b) (eff. Jan. 1, 2011).

¶ 56    Section 115-7.3 of the Code (725 ILCS 5/115-7.3 (West 2018)) provides a limited exception to this general prohibition on using other-crimes evidence to establish the defendant's propensity. See *Perez*, 2012 IL App (2d) 100865, ¶ 46. Under section 115-7.3, in prosecutions for certain delineated sex offenses, including those charged here, evidence that the defendant has committed a sex offense may be admitted for *any purpose*, including to establish his or her propensity to commit sex offenses. 725 ILCS 5/115-7.3(b) (West 2018). However, the court must first find the other-crimes evidence is relevant and, after considering the proximity in time and factual similarity to the charged offense and any other relevant facts and circumstances, its probative value outweighs its prejudicial effect. *Id.* § 115-7.3(c).

¶ 57                                C. This Case

¶ 58    We conclude the trial court did not err by instructing the jury it could consider the other-crimes evidence on the issues of defendant's identity and propensity to commit sex offenses against children. Here, the court performed the requisite balancing test and granted the State's motion to admit evidence of defendant's prior sexual abuse of J.J. to establish defendant's identity and propensity. Therefore, giving IPI Criminal No. 3.14, instructing the jury it could consider the other-crimes evidence on the issue of defendant's identity and propensity, was proper. See *People v. Heard*, 187 Ill. 2d 36, 60-61 (1999) (though not *required*, "[t]he better practice [is] for trial courts to instruct the jury *** of the limited purpose for which it may consider the other-crimes evidence"); *People v. Houseton*, 141 Ill. App. 3d 987, 993 (1986) (alibi defense places the defendant's identity at issue). At trial, defendant argued any reference to his propensity in the instruction highlighted the evidence, increasing its prejudicial impact. However, both defendant *and the State* are entitled to jury instructions that fully and fairly set forth the law applicable to the submitted evidence. *People v. Janik*, 127 Ill. 2d 390, 398 (1989).

¶ 59    We recognize other-crimes evidence is inherently prejudicial. *E.g.*, *Perez*, 2012 IL App (2d) 100865, ¶ 45. We do not agree, however, with defendant's suggestion the instruction increased the prejudicial effect of the evidence and disrupted the balance the court had previously struck in determining the evidence was admissible. Given the court determined the evidence was admissible to show both defendant's identity and his propensity—a ruling defendant does not challenge on appeal—omitting from the instruction the reference to propensity would have rendered the instruction incomplete as to the law applicable to the evidence. See *Bannister*, 232 Ill. 2d at 81.

¶ 60    Apparently recognizing that omitting from the instruction the reference to propensity would have rendered it incomplete as to the law applicable in this case, defendant argues, for the first time in his reply brief, the court erred by instructing the jury it could consider the other-crimes evidence on the issue of his identity because he did not actually raise an alibi defense. Rather, he raised an *incomplete* alibi defense that merely showed he had a limited opportunity to commit the offenses at issue. Defendant's argument on this point is forfeited. Ill. S. Ct. R. 341(h)(7) (Oct. 1, 2020) (points not argued in opening brief are forfeited and may not be raised for the first time in the reply brief).

¶ 61    Forfeiture aside, his argument is wholly inconsistent with the position he took at trial, and his thirteenth-hour attempt to rescind his alibi defense is not well taken. Admittedly, the evidence presented at trial showed he had only limited access to the victims because he worked daytime hours Monday through Friday and the victims testified the assaults mainly took place on nights and weekends. This evidence did not establish a complete alibi. It did not establish

defendant "was at a specified place other than the crime scene at the time of the offense." *People v. McCullough*, 2015 IL App (2d) 121364, ¶ 115. However, defendant maintained before and during trial that, because neither A.D.M. nor K.T.F. specified the dates and times of the assaults, he could provide only an incomplete alibi. By doing so, defendant placed his identity at issue. *Houseton*, 141 Ill. App. 3d at 993.

¶ 62    Defendant also asserts the prejudicial effect of the other-crimes evidence was "further exacerbated by the jury's confusion regarding the meaning of 'propensity' as used in IPI [Criminal No.] 3.14." He argues the jury's confusion was understandable because the instruction instructed the jury to consider the evidence for both a limited purpose and "the ultimate issue of [defendant's] guilt." The jury's question, standing alone, did not reflect the jury's confusion (see *People v. Smith*, 321 Ill. App. 3d 523, 532 (2001)), and without more, we are not able to agree with defendant's position.

¶ 63    In reaching our conclusion, we note this court has recently recognized there is an incongruity between IPI Criminal No. 3.14 and propensity evidence. See *People v. Potts*, 2021 IL App (1st) 161219. In *Potts*, the defendant was charged with first degree murder, and at trial, the trial court admitted (1) evidence of his history of domestic violence with two other women as evidence of his propensity to murder the victim and (2) evidence of other uncharged conduct as evidence of his motive and/or the victim's state of mind. *Id.* ¶ 171. After the close of the evidence, the court gave the jury a modified version of IPI Criminal No. 3.14, instructing the jury it had received evidence the defendant had been involved in offenses other than that charged in the indictment; the evidence received was on the issues of the defendant's propensity, motive, and state of mind; and that the evidence could be considered only for those limited purposes. *Id.* ¶ 181.

¶ 64    On appeal, the defendant contended, in part, the jury instruction, which did not delineate what uncharged conduct could be considered for what purpose, improperly allowed the jury to consider all of the other-crimes evidence as propensity evidence, even though only his history of domestic violence had been admitted for that purpose. *Id.* ¶ 171. Because he had forfeited the error, the defendant alleged plain error or, alternatively, ineffective assistance of counsel based on counsel's failure to object. *Id.* ¶ 172. We concluded the instruction was erroneous because, as written, it told the jury it could consider *all* of the other-crimes evidence for propensity purposes, but we nevertheless found the defendant was not entitled to a new trial because he had failed to establish plain error or ineffective assistance. *Id.* ¶ 225. In finding error, we stated the reference to the defendant's propensity should not have been included in IPI Criminal No. 3.14 because "[i]t did not belong there" and "never does." *Id.* ¶ 190. We explained, "[t]he whole point of giving [the instruction] is to *prevent* the jury from *** considering evidence for the purposes of propensity *** by listing the exclusive, *non-*propensity purpose(s) for which the jury may consider the other-crimes evidence." (Emphases in original.) *Id.* But we also recognized, when there is some other-crimes propensity evidence and some other-crimes evidence that cannot be considered for that purpose, "the trial court must chart a middle path." *Id.* ¶ 191. We explained, if the reference to propensity were removed from the given instruction, "the State would be entitled to an instruction that *certain* evidence *could* be considered for propensity purposes." (Emphases in original.) *Id.* Thus, we found, on one hand, a reference to propensity does not belong in IPI Criminal No. 3.14, but on the other, the State is entitled to have the jury instructed it may consider other-crimes evidence admitted for propensity purposes when such evidence is also admitted for nonpropensity purposes.

¶ 65    Admittedly, the purported error in *Potts* was not the reference to propensity in IPI Criminal No. 3.14 itself. Rather, the error was the fact the instruction did not tell the jury what other-crimes evidence could be considered for propensity and what could be considered only for the limited purposes. Nevertheless, as recognized in *Potts*, had the jury instruction at issue here omitted the reference to propensity, the State would have been entitled to an instruction that the evidence could be considered for propensity. *Id.* Thus, the trial court here properly "chart[ed] a middle path" (*id.*) by including both propensity and the limited purpose in the instruction.

¶ 66    In sum, we hold, when, as here, the same conduct is admitted for a limited purpose and also to prove a defendant's propensity, a trial court does not err by instructing the jury it may consider the evidence for both propensity and the limited purpose.

¶ 67                                    III. CONCLUSION

¶ 68    For the reasons stated, we affirm the judgment of the circuit court of Winnebago County.

¶ 69    Affirmed.