2021 IL App (2d) 190352-U
No. 2-19-0352
Order filed August 30, 2021

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Du Page County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 18-CF-475 |
| BYRON AUTERBERRY, | ) ) | Honorable Robert A. Miller, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE JORGENSEN delivered the judgment of the court.
Justices Hutchinson and Hudson concurred in the judgment.

**ORDER**

*Held*: The trial court did not err in excluding questions of racial bias during *voir dire*. Neither the introduction of other-crimes evidence nor cumulative error denied defendant a fair trial. Plain error occurred where defendant was ordered to pay restitution without an evidentiary basis for the award. Affirmed in part, reversed in part, cause remanded.

¶ 1    Following a jury trial, defendant, Byron Auterberry, was convicted of aggravated assault (720 ILCS 5/12-2(c)(7) (West 2018)), aggravated fleeing and eluding a peace officer (625 ILCS 5/11-204.1(a)(3) (West 2018)), and driving while license suspended (625 ILCS 5/6-303(a) (West 2018)). The trial court denied defendant's motion for a new trial and sentenced him to concurrent

terms of three years' imprisonment on the convictions for aggravated assault and fleeing and eluding, 364 days' imprisonment for driving without a license, and awarded restitution in the amount of $1,438.32. Defendant appeals. For the following reasons, we affirm in part, reverse in part, and remand.

¶ 2                                    I. BACKGROUND

¶ 3     The charges against defendant stemmed from events that occurred on February 27, 2018. That day, Elmhurst police officers Brandt Cappitelli and Alex Kefaloukos were working with a plain-clothes unit conducting an unrelated investigation and surveillance. However, around 4 p.m., Cappitelli spotted defendant parked in a handicapped spot at a Jewel grocery store in Bensenville. Defendant was sitting in the driver's seat, and Kelly Smith was seen leaving the store, carrying a large handbag. Cappitelli was aware that defendant and Smith were being investigated for a retail theft that had occurred at a Mariano's grocery store one month earlier, but, at that time, they had fled the scene and were not apprehended. During that investigation, Cappitelli learned that defendant's criminal history included weapons and other retail theft charges and that he possibly may have been armed and involved in gang activity. Accordingly, when Cappitelli saw defendant and Smith at the Jewel, he radioed Kefaloukos and conveyed what he had observed, as well as his suspicion that defendant might flee. Kefaloukos recalled the Mariano's retail theft, that defendant was involved, and that a store employee had been "battered" as defendant and a woman fled that scene. Apparently, Cappitelli told Kefaloukos that there was an outstanding warrant for defendant's arrest based on that offense and that defendant had "weapons offenses" and would "fight and run from the police." However, Kefaloukos did not mention this to a task force later charged with investigating the events at issue; rather, he told an investigating officer that Cappitelli said defendant was involved in a retail theft and there was "possibly" a warrant for defendant's

arrest. In fact, while there was an existing warrant for defendant for driving while license suspended (issued the day before these events), a warrant pertaining to the Mariano's retail theft did not issue until the day *after* the events at issue.

¶ 4 The two officers agreed that they would conduct a traffic stop of defendant's vehicle. Both officers were driving unmarked vehicles, which were equipped with internally-mounted flashing lights, sirens, and an in-squad video camera. Both officers were dressed in plain clothes; however, they wore vests with the word "police" displayed on the back, and the vests held their tasers, radios, magazine pouches for their weapons, and flashlights. They also wore badges, hanging from their necks, although there was some question at trial as to whether both badges were visible during the relevant events.

¶ 5 The officers followed defendant in their separate vehicles. Defendant stopped at a red light at the intersection of York and Crestview roads. It was rush hour, and traffic was heavy. Cappitelli, who was behind defendant, testified that he activated his vehicle's lights and siren, although no siren is heard on the video of the events. Kefaloukos, who drove around the left-turn lane and parked his vehicle partially in front of defendant's vehicle, was unable to activate his car's flashing lights, but he exited his car and stood in front of defendant. Kefaloukos testified that he yelled, "police," although that was not captured on video, other witnesses testified they did not hear him do so, and he did not mention doing so to the task force later charged with investigating the incident. Defendant began to inch his vehicle forward. Kefaloukos yelled, "Stop, stop, don't move!" Cappitelli, in turn, exited his vehicle and approached the driver's side of defendant's vehicle, saying "Don't you dare." He did not announce, "police." Cappitelli drew his weapon and repeatedly ordered defendant to open his door; defendant refused. Cappitelli holstered

his weapon, then forcefully opened the door. Defendant grabbed the door, shut it, and drove forward.

¶ 6    Kefaloukos testified that defendant's car started driving toward him. He thought he "was going to die," and that defendant would "run [him] over to get away." Bystander witnesses also testified that they knew the officers were police officers by the flashing vehicle lights, their vests, and one officer's badge, and one witness testified that it appeared that defendant was going to hit Kefaloukos with his vehicle. Kefaloukos moved to the right and twice fired his weapon, hitting defendant's driver's side window and shattering it. Defendant drove off, side-swiping another vehicle on the way. He drove south on York Road, down Lake Street, and onto eastbound I-290. Kefaloukos was not allowed to "chase" defendant in an unmarked squad car; he saw a State trooper on I-290's shoulder and asked that officer to send a dispatch about defendant over the police emergency radio network.

¶ 7    Northlake police officer Damon Allenson heard the transmission of a "shots fired" call from Elmhurst. In a marked vehicle, with lights and sirens activated, Allenson followed defendant as he drove through stop signs without stopping, made abrupt lane changes, and drove almost 95 miles per hour through heavy traffic. As they approached Melrose Park, defendant cut off cars, hopped a curb, and traveled over the curb, rocks, and toward a bus shelter before heading back onto North Avenue. Allenson lost defendant, but his squad car recorded the chase and the video was played for the jury.

¶ 8    Northlake officer Kruschke (first name unknown) picked up the chase, again with activated lights and a siren. Defendant jumped another curb and drove down a sidewalk, before returning to the roadway at a high rate of speed and while passing other vehicles. Kruschke followed defendant into a residential area, where defendant did not obey traffic signs, traveled the wrong

way down a one-way street, and hit the rear end of a car. Krushcke received a call from his supervisor to terminate the pursuit. The video from his squad car was also played for the jury.

¶ 9    Defendant was charged with two counts of aggravated assault against Officer Kefaloukos, alleging that, knowing Kefaloukos to be a police officer, he: (1) drove his car in Kefaloukos's direction and placed him in reasonable apprehension of receiving a battery; and (2) knowingly operated his vehicle in a manner that placed Kefaloukos in reasonable apprehension of being struck by a motor vehicle. In addition, defendant was charged with aggravated fleeing and eluding because, "after having been given a visual or audible signal directing him to bring his vehicle to a stop by Officer Kefaloukos," defendant "willfully fled or attempted to elude Officer Kefaloukos" and caused over $300 in property damage. Finally, defendant was charged with a Class A misdemeanor of driving with a suspended license.

¶ 10    At trial, defendant's main arguments were, in sum, that he did not know that the officers were, in fact, police officers when they surrounded him and drew their weapons and, therefore, instinct told him to quickly get away and, further, that the video reflected that Kefaloukos was not reasonable in apprehending that he might be struck by the vehicle.

¶ 11                        A. Motions *In Limine*

¶ 12    Some of the aforementioned evidence was introduced at trial over defendant's objection. Specifically, before trial, the State moved *in limine* to admit evidence of other crimes, namely, the two car chases conducted by the Northlake police and the videos memorializing those chases. The State argued the evidence was relevant to show absence of mistake, intent, motive, consciousness of guilt, and a continuing narrative. Defendant, in turn, moved *in limine* to exclude the same evidence, arguing that the charges made relevant only his actions as they related to Officer Kefaloukos and, therefore, his flight or attempts to elude officers from other jurisdictions was

irrelevant and highly prejudicial. Defense counsel also argued that, if the court were inclined to admit evidence of the Northlake chases, the videos should nevertheless be excluded because, in terms of the manner of defendant's driving, they were highly prejudicial.

¶ 13    The court allowed the State to introduce the evidence for consciousness of guilt and to show the jury that defendant was not "some sort of victim of a random shooting and that if he's fleeing from the police, he is the one who had done something wrong." The court did not limit the State from presenting the videos, but noted that the defense could object at trial, and it reserved ruling on whether the evidence was admissible for purposes other than consciousness of guilt.

¶ 14    Defendant moved the court to reconsider, arguing that the evidence was highly prejudicial, which outweighed its relevance as to consciousness of guilt, because it cast defendant in a negative light and risked the jury deciding the case based on post-incident conduct, not the facts alleged in the indictment. The court disagreed, noting that, while it believed that there were different interpretations for the flight, that was the purpose of the trial, it was the jury's responsibility to determine how to interpret and weigh the evidence, and that the State would be allowed to use evidence of flight. In addition, the court noted that the type of flight was also relevant, as "walking away at a very slow pace is different than driving 100 miles per hour. One is a much more desperate attempt to flee and, I think, the jury should be entitled to ascribe a weight to the value of the evidence regarding flight[.] *** [A]ny videos regarding the evidence of flight [are] relevant, and although prejudicial, not so prejudicial that it outweighs the probative value."

¶ 15    Later, the court ruled the evidence was also admissible for the other-crimes purposes of intent, motive, and knowledge, although it denied the State's request to introduce the evidence to demonstrate absence of mistake.

¶ 16                                   B. *Voir Dire*

¶ 17     During *voir dire*, when defense counsel commenced his questioning, he asked whether the jurors could be fair, given that the alleged victim was a police officer and support for police officers was "a bit of a hot-button topic" recently.  The jurors indicated that they could be fair.  The following exchange then occurred:

> "DEFENSE COUNSEL: Okay, thank you. This is another question I put out to everybody, but I'm going to start with one person for no particular reason. But I'll ask, Juror Number 62, can you understand the concern [defendant's attorneys] would have here in seeing that our client here is the only African-American in the room, perhaps not the only, but one of the few in the room. Can you understand what concerns we might have in this context –
>
> STATE: Judge, may I approach?
>
> THE COURT: Yes.
>
> (Whereupon, the following sidebar was had outside the hearing of the jury:)
>
> DEFENSE COUNSEL: Judge, I corrected myself.
>
> STATE: Judge, yeah, but I would just object to this line of questioning, I mean.
>
> THE COURT: I'm not sure what the question is.
>
> STATE: I don't know what they're trying to get at.
>
> DEFENSE COUNSEL: I'm asking what concerns might there be that there is only one—an African-American on trial.  I'm trying to address that and create a conversation about race here and if there is any prejudice.
>
> THE COURT: Objection is sustained."

¶ 18     Defense counsel resumed his *voir dire*, continuing:

"DEFENSE COUNSEL: All right. Juror Number 62, again, I just at random picked you, but seeing our client, is there anything about *his appearance* that might cause you to give him less than the full presumption of innocence?

STATE: Judge, may –

THE COURT: Is it the same objection?

STATE: It is.

THE COURT: *Overruled* as to that question.

PROSPECTIVE JUROR: No, sir.

DEFENSE COUNSEL: Would *anybody* have any issues with that? Okay. And everybody is indicating *no*. Okay." (Emphasis added.)

¶ 19    Before trial commenced, the court instructed the jury with part of Illinois Pattern Instructions, Criminal, No. 1.01 (4th ed. 2000) (hereinafter, IPI Criminal 4th No. 1.01), namely, "It is your duty to determine the facts and to determine them only from the evidence in this case. You are to apply the law to the facts and in this way decide the case. Neither sympathy nor prejudice should influence you."

¶ 20                            C. Other Trial Evidence

¶ 21    In addition to the evidence summarized above, we note that the evidence at trial also reflected that Vanessa Auterberry (defendant's sister) and Kelly Smith were present in defendant's car during all relevant events. In a recorded interview, Vanessa stated that she knew police officers stopped defendant, that she saw a badge, and that the unmarked cars had activated flashing lights. In the interview, Vanessa said that she told defendant to stop, but "He said no. I'm not going to jail." She testified at trial that, when she told him to stop, he said he needed to go to the hospital and was not going back. Defendant was shot in the arm and leg and was bleeding. However,

defendant did not go home or to the hospital. Ultimately, Vanessa took police to a relative's house, where defendant was staying. He was arrested and taken to the hospital.

¶ 22   Kelly Smith testified that, at the time of trial, she was in jail for pending retail theft and burglary charges. Defendant was her boyfriend. Smith told police that, when officers Cappitelli and Kefaloukos were standing outside defendant's car, defendant said, "We're not going back to jail."

¶ 23    Bystander Stephen Smith testified that defendant hit his car when fleeing and that he sustained over $800 in damages.

¶ 24   In closing argument, with respect to the aggravated-fleeing-and-eluding charge, defense counsel stated, "I think then it's very important to point out to you, ladies and gentlemen, this only applies to the situation that you just saw on video regarding Officer Kefaloukos and the Elmhurst Police Department. That entire video chase that you saw was for a different jury in a different county with a different prosecutor and a different judge." The court sustained the State's objection to that comment and sustained a second objection when defense counsel continued, "He is not charged with fleeing from the Northlake Police Department." However, thereafter, counsel continued, without objection, "When you look at the evidence here and you look at the instructions in this case, ladies and gentlemen, he is—the State must show the proposition as they relate to Officer Kefaloukos, not to the Northlake Police Department."

¶ 25   Further, to protect against the jury improperly determining guilt based upon defendant's flight from the Northlake police officers, the trial court agreed with defendant's suggested modifications to some instructions, such that the jury was instructed that it needed to determine specifically whether defendant fled from *Kefaloukos*. In addition, the jury was again reminded that neither sympathy nor prejudice should influence its deliberations. Finally, as to evidence

pertaining to crimes other than those charged in the indictment, the jury was instructed, "This evidence has been received on the issues of the defendant's intent, motive, and knowledge, and may be considered by you only for that limited purpose."

¶ 26                                    D. Posttrial Motion

¶ 27    In his motion for a new trial, defendant argued, in part, that the court erred in admitting other-crimes evidence of his flight from Northlake police. In contrast to the short video depicting the events that formed the basis of the charges, defendant argued the two videos of the Northlake chases were longer and very prejudicial, as his risky driving could have inflamed the jury.

¶ 28    Further, defendant argued that the court erred in not allowing him to question the potential jurors about their racial viewpoints, particularly given that the alleged victim was a white police officer, defendant was African-American, and the officer shot defendant while he was unarmed. Given the "hot button" societal issues of racial justice and policing, defendant argued that the court denied him a fair trial by not permitting him to inquire about each juror's potential biases on racial issues. The court asked which questions it had prohibited, and defense counsel explained that he had asked one question, the court sustained the State's objection, and "we didn't explore it any further." The State, in turn, recalled, "there was a question that was posed to the jury with respect to whether they had a problem with the defendant being the only African-American in the room, and I believe that at that point we raised the objection, and there was no further argument made." Moreover, the State continued, "I do believe that [defendant] had the opportunity and did question the jury in *voir dire* with respect to any bias, and I believe that the State in particular read the instruction that neither prejudice or bias or sympathy should influence them, and that was read by Your Honor as well, and they had the opportunity to read that as well."

¶ 29    The court denied defendant's motion. It took defense counsel at his word as to the question he had posed to the jury and the court's ruling thereon, but noted,

> "I don't recall whether or not there were other questions that the defense asked that were allowed or whether that somehow abbreviated the entire line of questioning due to my ruling.
>
> I don't believe I would have stopped the defense from asking questions regarding race, and I—and without the transcript for me to look at, I'm not sure of the context in which this question was asked and the objection was sustained.
>
> However, I do believe that the defendant was given a fair trial, that the Court did not make any errors, and any errors pointed out by the defense would not be of such a substantial significance that it would require the verdict to be vacated in order to preserve the defendant's constitutional rights, and therefore, the motion for a new trial is denied."

¶ 30                                    E. Sentencing

¶ 31    At sentencing, in addition to various terms of imprisonment, the State requested that the court order restitution to Smith in the amount of $1,438.32. No evidence was presented to reflect the basis for that figure.

¶ 32    Defendant offered a statement in allocution, in which he claimed responsibility for some mistakes, but explained to the court that he did not intend to run over Kefaloukos. The court responded that it believed defendant drove his car in such a manner that Kefaloukos "clearly" could have reasonably apprehended he would be struck. That said, the court noted that it also did not believe that defendant intended to run over Kefaloukos with the car. Further,

> "I don't think you tried to kill the police officer. That doesn't mean that the police officer didn't think he was going to die.

He's got a millisecond with this car all of a sudden hitting the gas coming towards him. At that very moment, that officer thought he was going to die, he didn't have time to sit down, reflect, look at videos, then decide what his emotion would be.

That was his emotion in that split-second freeze frame. That was what he thought. I don't think the officer is lying about that."

¶ 33   The court announced that it was sentencing defendant to concurrent terms of three years' imprisonment on the convictions for aggravated assault and fleeing and eluding and 364 days' imprisonment for driving without a license. The State reminded the court about restitution, and the court added restitution to Smith in the amount of $1,438.32. Defendant appeals.

¶ 34                                II. ANALYSIS

¶ 35                                A. *Voir Dire*

¶ 36   On appeal, defendant argues first that the trial court erred where, during *voir dire*, it refused to allow his supplemental question about racial bias. He notes that, without proper opportunity to investigate potential bias or prejudice among jurors, a defendant lacks the ability to intelligently utilize peremptory challenges or to ultimately establish that the impaneled jury was actually prejudiced. Defendant urges that the issues of race and policing may evoke strong opinions and, as this case involved both, the court's refusal to allow defendant to question jurors about racial bias or prejudice denied him his right to a fair trial before an impartial jury.

¶ 37   The right to a fair and impartial trial is protected by both the federal and state constitutions. See *People v. Bull*, 185 Ill. 2d 179, 214 (1998); see U.S. Const., amend. VI, XIV; Ill. Const. 1970, art. I, §§ 8, 13. The entire purpose of *voir dire* is to select an impartial jury. See *Duncan v. Peterson*, 408 Ill. App. 3d 911, 923 (2010). The trial court's management of that process, along with its decision to allow specific questions to prospective jurors, is reviewed for an abuse of

discretion. *Id*. An abuse of discretion occurs only where the trial court's decision is arbitrary, fanciful, or unreasonable. *People v. Lerma*, 2016 IL 118496, ¶ 23. Reversible error will be found only where the trial judge's conduct during *voir dire* thwarted the selection of an impartial jury. *Duncan*, 408 Ill. App. 3d at 923.

¶ 38    As defendant acknowledges, our supreme court has held that, absent special circumstances requiring questions about racial prejudice, asking jurors generally whether bias or prejudice would affect their judgment provides sufficient opportunity to discover any such biases or prejudices. See, *e.g.*, *People v. Peeples*, 155 Ill. 2d 422, 459-61 (1993). There is no constitutional presumption of juror bias, and the "sole fact that the defendant is black and the victim is white 'does not constitute a "special circumstance" of constitutional proportions.' " *Id.* at 460 (quoting *Turner v. Murray*, 476 U.S. 28, 33 (1986)). However, defendant is also correct that, in 2020, the supreme court issued a statement on racial justice, acknowledging, in part, frailties in our public institutions that disproportionately impact people of color in Illinois, that the existence of racism diminishes the rights and benefits sacred to all, and noting the creation of a civil pattern jury instruction concerning implicit bias. See https://ilcourtsaudio.blob.core.windows.net/antilles-resources/resources/62e3902f-8750-4d17-9768-07815daaf869/062220.pdf (last accessed August 11, 2021); Illinois Pattern Jury Instructions, Civil, No. 1.08 (Notes on Use and Comment approved May 2018; Notes on Use revised May 2019).[1]   Defendant further notes that, in *Pena-Rodriguez v. Colorado*, ___U.S. ___, 137 S. Ct. 855 (2017), the Supreme Court explained that the judicial system has a duty to confront racial bias in the jury system to protect against a systemic loss of

---

[1] On April 30, 2021, a criminal pattern jury instruction on implicit bias was approved. Illinois Pattern Jury Instructions, Criminal, No. 1.01B (approved April 30, 2021).

confidence in verdicts. *Id*. at 868-69 (although, we would note that the Court there also explained some of the difficulties that trial courts face in attempting to address racial bias with prospective jurors. See *id.* at 867). In addition, in his reply, defendant notes recent commentary by dissenting justices concerning the existence and effect of implicit biases on systemic racism. See, *e.g.*, *People v. Birge*, 2021 IL 125644, ¶ 152 (Neville, J., dissenting); *People v. Radford*, 2020 IL 123975, ¶ 212 (Neville, J., dissenting); *People v. Williams*, 2020 IL App (3d) 180024, ¶ 77 (McDade, J., dissenting).

¶ 39 With due respect to the importance of the principles raised, we nevertheless find no error here.[2] We certainly do not take issue with the judiciary's important responsibility to seriously examine potential racial biases that may affect juror impartiality. See *id.* However, while awareness of the issues impacting racial justice, including biases and prejudices that might impact jury deliberations, is critically important, it does not automatically follow that error occurred *here*.

¶ 40 Indeed, the trial court acted reasonably and did not, in fact, preclude defendant from pursuing racial inquiries. Specifically, defendant challenges the court's decision to sustain the State's objection to defense counsel's first question touching on defendant's race. Again, defense counsel said, "But I'll ask, Juror Number 62, can you understand the concern [defendant's attorneys] would have here in seeing that our client here is the only African-American in the room, perhaps not the only, but one of the few in the room. Can you understand what concerns we might have in this context[?]" Although it is true that the State framed its objection as one to the "line

___

[2] Indeed, recently, in an unpublished decision, we considered and rejected similar arguments. See *People v. Whetstone*, 2020 IL App (2d) 170919-U, ¶ 63, appeal denied, 159 N.E.3d 951 (Ill. 2020).

of questioning," only one question had been posed, and it asked whether the jury could understand why defense *counsel* might be concerned that defendant was one of only a few African-American persons in the room. As such, as posed, the question did not clearly address potential bias harbored by the *jurors* themselves, so much as it queried the jurors about their understanding of counsel's concerns. We cannot conclude that the court abused its discretion in sustaining the State's objection to that question. Notably, having brought attention to defendant's race, defense counsel next asked whether there was anything about defendant's *appearance* that would prevent the *jury* from being fair, and the court *overruled* the State's objection to that question. The jury indicated that it could be fair, and the defense *did not pursue any further questioning* concerning race. While we disagree with the State that, under the circumstances of this case, counsel's failure to ask additional questions about race invited the alleged error such that he may not now complain, we also disagree with defendant's suggestion that his only choice would have been to defy the court's ruling. Again, one unclear question was posed and disallowed, but another posed question was permitted. Counsel did not ask additional questions, and, while, in later argument, counsel mentioned it might have been illuminating to know, for example, whether the jurors were inclined to support the "Black Lives Matter" or "Blue Lives Matter" movements, he never tried to ask those questions. Nor does the record contain an offer of proof as to the specific questions counsel would have pursued or how those questions would have properly informed the parties about potential bias in this case. The court never had an opportunity *to allow or reject* those theoretical questions.

¶ 41 As pointed out by the State, both before trial commenced and again before deliberating, the jury was instructed, in accordance with IPI Criminal 4th No. 1.01, that neither sympathy nor prejudice should influence its deliberations. See *People v. Taylor*, 166 Ill. 2d 414, 438 (1995) ("The jury is presumed to follow the instructions that the court gives it"). The court in *Peeples*

held that, absent special circumstances that do not exist here, similar guidance was sufficient. *Peeples*, 155 Ill. 2d at 460. Despite defendant's assertions to the contrary, we do not agree that this case concerned an issue of "particular controversy," namely purported violence by a black defendant against a white police officer, although, to a degree, those facts, of course, existed. Rather, the focus of trial and the relevant issues for the jury to decide were whether defendant knew Kefaloukos was a police officer and whether Kefaloukos reasonably apprehended a battery. In fact, in relation to another argument, defendant states on appeal, "[i]n this case, the disputed issues for the jury to decide centered around whether [he] knew that the two men who approached him with guns drawn were police officers and whether, when he drove away from them, he drove in such a way that he placed Officer Kefaloukos in reasonable apprehension of being struck by his car." We completely agree. Again, the jury was also instructed that it should not be influenced by prejudice, and defense counsel confirmed that the jurors believed they could be fair, regardless of defendant's race or Kefaloukos's status as a police officer. As such, we do not find the court's actions unreasonable here, where it sustained one objection to a question, overruled an objection to a second question, and then was not again confronted with questioning concerning race. Thus, we reject defendant's contention that the court's ruling during *voir dire* deprived him of a fair trial by an impartial jury.

¶ 42                    B. Other-Crimes Evidence

¶ 43    Defendant next argues that he was denied a fair trial because it was contaminated by excessive and highly prejudicial other-crimes evidence. He asserts that the court erred in allowing the State to present excessive, cumulative, and prejudicial evidence concerning the Northlake police car chases, as well as testimony alleging defendant's involvement in weapons charges, possible gang activity, and that he might be armed.

¶ 44   Other-crimes evidence is generally inadmissible to prove a defendant's propensity to commit crime, but it may be admissible to prove motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.  Ill. R. Evid. 404(b) (eff. Jan. 1, 2011). Even if other-crimes evidence falls under one of these exceptions, however, the court can still exclude it if the prejudicial effect of the evidence substantially outweighs its probative value. *People v. Donoho*, 204 Ill. 2d 159, 170 (2003).  Indeed, although admissible for certain purposes, other-crimes evidence is unquestionably prejudicial, and the risk of admission is that the jury will convict the defendant because it believes he or she is a bad person deserving of punishment.  See *People v. McDaniel*, 2021 IL App (2d) 190496, ¶ 55.  We review for an abuse of discretion the trial court's decision to admit evidence of other crimes.  See, *e.g.*, *People v. Wilson*, 214 Ill. 2d 127, 136 (2005).

¶ 45   Here, the trial court expressly balanced the evidence's probative value against its prejudicial effect, and it did not abuse its discretion in admitting evidence of the Northlake police chases.  Defendant's main contention, in sum, is that the Northlake police-chase evidence was prejudicial because the two videos were cumulative, reflected highly-risky driving, and did not serve to inform the jury on the issues charged, namely, whether defendant's actions with respect to *Kefaloukos* created a reasonable apprehension of battery and whether he fled from *Kefaloukos*, not the Northlake police.  While the evidence was certainly prejudicial, we agree with the court that its relevance outweighed the prejudice.  Indeed, defendant's flight was highly probative on the issue whether he knew the men who surrounded his car were police officers, or whether he believed in that moment that he was the victim of a random crime and, as he argued at trial, "instinct" told him to get out of the situation quickly.  See, *e.g.*, *People v. Lewis*, 165 Ill. 2d 305, 350 (1995) (flight may be considered as tending to prove consciousness of guilt).  As the trial court

put it, the evidence tended to suggest that defendant was not, "some sort of victim of a random shooting and that if he's fleeing from the police, he is the one who had done something wrong." The evidence rebutted defendant's contention that he believed he was a victim; if so, why did he not stop when uniformed Northlake police in marked vehicles with lights and sirens activated, pursued him? And, the risky driving, *i.e.*, traveling at a high rate of speed, disregarding traffic signs, passing a school bus, jumping curbs, rear-ending another vehicle, etc., served to illustrate the lengths defendant went to avoid apprehension, which was inconsistent with his characterization of himself as a person merely fearful for his life and those of his vehicle's occupants.

¶ 46 Defendant argues that, even if testimony concerning the Northlake chases and his erratic driving was properly admitted, because officers Allenson and Krushke had already testified to those events, showing the jury the videos was cumulative and highly prejudicial. We disagree and find the authority defendant cites in support of his position highly distinguishable. In *People v. Smith*, 2017 IL App (1st) 143728, ¶ 98, the court held that contents of a 911 recording were cumulative and should not have been admitted where the person who placed the call had already testified about the contents of the call. However, it is critical to note that, during the caller's trial testimony, she was unable to control her emotions, was "hysterical" and crying, jurors were themselves crying, and, so, the court held that, under those circumstances, also introducing the "exceptionally emotional" 911 recording was overly prejudicial. *Smith*, 2017 IL App (1st) 143728, ¶¶ 55-62, 65-68. Moreover, we note that, despite its ultimate ruling in that case, the court in *Smith* nevertheless recognized that evidence cumulative to oral testimony may be admissible. *Id.* ¶ 68. Further, in *People v. Thigpen*, 306 Ill. App. 3d 29, 38 (1999), the court held that photos should not have been admitted, where a witness had already testified to the other crime; yet, there, the jury received photos *of the victims* of a double murder that occurred following the charged crime.

"Courts often find photos *of the victim of the crime charged* to be too inflammatory properly to be sent to the jury. [Citation.] To send back a photo of the victims of *another* crime laid at the defendant's feet is extraordinary." (Emphasis in original) *Thigpen*, 306 Ill. App. 3d at 38. The facts here are simply not sufficiently analogous to warrant the same conclusion.

¶ 47 Defendant also notes that the video of his encounter with Kefaloukos showed his flight in a "matter of seconds," while "along with Officers Kruschke and Allenson's play-by-play of events, the videos of the Northlake car chases went on for almost 10 minutes." We simply disagree that this necessarily created a "mini-trial" on the other-crimes evidence. We also disagree that there is a significant risk that the jury was confused and could have used his flight from the Northlake officers to convict him for fleeing and eluding the Elmhurst police. Defense counsel highlighted this distinction during closing arguments and, although the court sustained one objection that, in context, flowed from another line of commentary that the court found improper, the court clearly agreed with defense counsel that, to further minimize any such risk, the jury instructions would emphasize that the relevant conduct was only that which pertained to Kefaloukos. Moreover, we note that the court properly limited the jury's permitted use of the other-crimes information, instructing it that, "this evidence has been received on the issues of the defendant's intent, motive, and knowledge, and may be considered by you only for that limited purpose." Again, we presume the jury obeyed its instructions. *Taylor*, 166 Ill. 2d at 438.

¶ 48 Defendant also argues that the court improperly allowed the State to introduce evidence of other crimes allegedly committed by defendant, where Cappitelli and Kefaloukos were permitted to mention defendant's alleged "weapons charges" and "gang activity." Defendant concedes that he did not object to this testimony at trial, but asserts that, as a matter of plain error and

cumulatively with the car chase evidence, it exacerbated the prejudice to him and denied him a fair trial.

¶ 49    As defendant concedes, to the extent that counsel did not properly object or preserve an issue below, such that it is forfeited, but the plain-error doctrine allows a criminal defendant to obtain appellate review of procedurally-forfeited errors that occurred at trial. *People v. Rinehart*, 2012 IL 111719, ¶ 15; see Ill. Sup. Ct. R. 615(a) (eff. Jan. 1, 1967).  Plain error is invoked only where the evidence is closely balanced (prong one), or the alleged error is so substantial that it deprived the defendant of a fair trial (prong two).  *People v. Hampton*, 149 Ill. 2d 71, 100 (1992). In this appeal, defendant asserts error under both prongs.  Both prongs of plain error require an initial determination that error occurred.  *People v. Glasper*, 234 Ill. 2d 173, 203-04 (2009). Defendant's claim here fails because, for the following reasons, we find no error.

¶ 50    Kefaloukos and Cappitelli were permitted to mention their understanding of defendant's criminal history to explain their course of conduct; namely, why they suspected defendant would flee and why they chose to block him with their cars at an intersection, instead of conducting a traditional traffic stop on the side of the road, and why they approached defendant in the manner that they did.  Defendant concedes that, generally, police officers may testify to information received during the course of an investigation to explain why they took a particular course of action.  See, *e.g.*, *In re Jovan A.*, 2014 IL App (1st) 103835, ¶ 23.  Further, here, defense counsel cross-examined the officers about the veracity of their information, and the testimony on these issues, when viewed in the context of all the evidence, was minimal.  Defense counsel did not object, as noted, and while we cannot speculate as to counsel's trial strategy for not objecting, we do believe that counsel's use of the evidence and its lack of emphasis at trial reflects that it was not overly prejudicial.  We find no error and honor the forfeiture on this issue.

¶ 51                                    C. Cumulative Error

¶ 52     Defendant argues next that the cumulative effect of the denial of his counsel's inquiry into racial bias during *voir dire* and the improper admission of other-crimes evidence deprived him of his due process right to a fair trial and warrants a new trial. He argues that racial stereotypes about him and the victim could have influenced the jury's assessment of his guilt. Defendant urges that the excessive and unnecessarily cumulative evidence of the Northlake police chases served only to inflame any existing prejudice that the jury might have had and to evoke horror and contempt toward him. Further, he contends that the officers' unproven testimony about defendant's alleged prior weapons charges, being involved in gang activity, committing a battery during a prior retail theft, and having a propensity to fight and flee from police only "fed into the stereotype of the Black man as a violent, dangerous criminal." Defendant contends that the cumulative impact of these serious errors denied him a fair trial. We disagree.

¶ 53     Generally,

> " '[W]here errors are not individually considered sufficiently egregious for an appellate court to grant the defendant a new trial, but the errors, nevertheless, create a pervasive pattern of unfair prejudice to the defendant's case, a new trial may be granted on the ground of cumulative error.' [Citation.] 'However, the cumulative errors that warrant such an extreme result must themselves be extreme.' [Citation.] 'There generally is no cumulative error where the alleged errors do not amount to reversible error on any individual issue.' " [Citation.] *People v. Sims*, 2019 IL App (3d) 170417, ¶ 55 (2019).

¶ 54     Here, as explained above, defendant's arguments do not reflect error, and none amounts to reversible error. The record does not reflect any unfair prejudice to defendant's case. As such, they do not, cumulatively, require a new trial.

¶ 55                                      D. Restitution

¶ 56    Finally, in supplemental briefing, defendant argues that this case must be remanded for a new hearing on restitution because the court committed plain error when it ordered restitution without an evidentiary basis for the $1,438.32 awarded to Smith. Defendant notes that, here, the court did not receive any information to evaluate the actual costs that Smith incurred. Relying on *People v. Birge*, 2021 IL 125644, ¶¶ 44-45, defendant asserts that, even where this issue was not objected to below, it constitutes second-prong plain error and the denial of a fair sentencing hearing.

¶ 57    The State confesses error and we agree. Indeed, Smith testified only that the damage to his car exceeded $800. No evidence showing Smith's actual expenses or losses was presented at sentencing. Thus, reviewing the issue for second-prong plain error, the trial court's award of $1,438.32 in restitution to Smith, with no evidence or testimony presented to verify the actual costs Smith incurred, constitutes a clear and obvious error that affected the fairness of defendant's sentencing hearing. Thus, we remand for a new hearing on restitution.

¶ 58                                      III. CONCLUSION

¶ 59    For the reasons stated, the judgment of the circuit court of Du Page County is affirmed in part, reversed in part, and the cause is remanded.

¶ 60    Affirmed in part, reversed in part; cause remanded.